1

2      UNITED STATES BANKRUPTCY COURT

3      EASTERN DISTRICT OF NEW YORK

4      Case No. 09-45657-ess

5      - - - - - - - - - - - - - - - - - - - -x

6      In the Matter of:

7

8      87-10 51ST AVENUE OWNERS CORP.,

9

10                  Debtor.

11

12     - - - - - - - - - - - - - - - - - - - -x

13

14                  United States Bankruptcy Court

15                  271 Cadman Plaza East

16                  Brooklyn, New York

17

18                  June 8, 2012

19                  4:37 PM

20

21     B E F O R E:

22     HON. ELIZABETH S. STONG

23     U.S. BANKRUPTCY JUDGE

24

25

```
 1
 2   [527] Order to Show Cause (re: related document 5230 directing
 3   Empire State conglomerates, Inc. to refrain from interfering
 4   with the collection of rents and to sign the Settlement
 5   Agreement and Mutual Releases)
 6
 7   [534] Order to Show Cause why KTA's motion to be relieved as
 8   counsel should not be restored to the Court's calendar, and why
 9   KTA should not be relieved as counsel to Empire (related
10   document 504 Motion to Withdraw as Attorney filed by
11   Stockholder Empire State Conglomerates, Inc.)
12
13
14
15
16
17
18
19
20   Transcribed by:  Dena Page
21   eScribers, LLC
22   700 West 192nd Street, Suite #607
23   New York, NY 10040
24   (973)406-2250
25   operations@escribers.net
```

```
 1

 2    A P P E A R A N C E S :

 3    DICONZA TRAURIG MAGALIFF LLP

 4         Attorneys for 87-10 51st Avenue Owners Corp.

 5         630 Third Avenue

 6         7th Floor

 7         New York, NY 10017

 8

 9    BY:   HOWARD P. MAGALIFF, ESQ.

10

11

12    EMMET, MARVIN & MARTIN, LLP

13         Attorneys for NCB

14         120 Broadway

15         32nd Floor

16         New York, NY 10271

17

18    BY:   PAUL T. WEINSTEIN, ESQ.

19         HOWARD S. SCHIFF, ESQ.

20

21

22

23

24

25
```

```
 1

 2    KUDMAN TRACHTEN ALOE LLP

 3            Attorneys for Empire State Conglomerate

 4            350 Fifth Avenue

 5            Suite 4400

 6            New York, NY 10118

 7

 8    BY:    PAUL H. ALOE, ESQ.

 9

10

11    MILLER & MILLER LLP

12            Attorneys for Shareholders Group

13            73-11 184th Street

14            Flushing, NY 11366

15

16    BY:    JOEL E. MILLER, ESQ.

17

18

19    TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.

20            Attorneys for Official Committee of Unsecured Creditors

21            425 Park Avenue

22            New York, NY 10022

23

24    BY:    ALEX SPIZZ, ESQ.

25
```

```
 1

 2   SILVERMANACAMPORA LLP

 3         Attorneys for Mr. Jacinto Chua

 4         100 Jericho Quadrangle, Suite 300

 5         Jericho, NY 11753

 6

 7   BY:   GERARD R. LUCKMAN, ESQ.

 8

 9

10   GERSTEN SAVAGE LLP

11         Attorneys for Robert Valdes-Clausell

12         600 Lexington Avenue

13         9th Floor

14         New York, NY 10022

15

16   BY:   PAUL A. RACHMUTH, ESQ.

17

18

19   UNITED STATES DEPARTMENT OF JUSTICE

20         Office of the United States Trustee

21         271 Cadman Plaza East

22         Suite 4529

23         Brooklyn, NY 11201

24

25   BY:   MARYLOU MARTIN, ESQ.
```

```
 1

 2   LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C.

 3        Attorney for DOUGLAS T. TABACHNIK

 4        63 West Main Street

 5        Suite C

 6        Freehold, NJ 07728

 7

 8   BY:   DOUGLAS T. TABACHNIK, ESQ. (Telephonically)

 9

10

11   ALSO PRESENT:

12        JAMES SHEEHAN, Empire State Conglomerate

13        PAUL PETERSON, Empire State Conglomerate

14        ERIK GARCIA, Empire State Conglomerate

15        ROBERT VALDES-CLAUSELL

16        MICHAEL MEADVIN, Chairman, Official Committee of

17           Unsecured Creditors (Telephonically)

18

19

20

21

22

23

24

25
```

87-10 51ST AVENUE OWNERS CORP.

1               P R O C E E D I N G S

2          THE COURT:  Please be seated.

3          THE CLERK:  Numbers 1 and 2 on the calendar, 87-10

4   51st Avenue Owners Corp.  Orders to show cause.

5          Judge, parties on the telephone and in the courtroom.

6          THE COURT:  Good afternoon.  We have parties here in

7   the courtroom and also participating by phone.  I'd like to get

8   appearances here in the courtroom first.

9          MR. MAGALIFF:  Good afternoon, Your Honor.  Howard

10  Magaliff; DiConza Traurig Magaliff, counsel for 87-10 51st

11  Avenue Owners Corp.

12         THE COURT:  Thank you, Mr. Magaliff.

13         MR. ALOE:  Paul Aloe of Kudman Trachten Aloe, for

14  Empire State Conglomerate.  With me today are James Sheehan,

15  Paul Peterson and Erik Garcia, who are the three principals of

16  Empire.

17         THE COURT:  Thank you.  Thank you all.  I appreciate

18  the compliance with my order.

19         MR. SPIZZ:  Yes.  Alex Spizz; Todtman, Nachamie, Spizz

20  & Johns; attorneys for the official committee of unsecured

21  creditors.

22         THE COURT:  Thank you, Mr. Spizz.

23         MR. WEINSTEIN:  Paul Weinstein and Howard Schiff from

24  Emmet, Marvin & Martin, for NCB.

25         THE COURT:  Thank you very much.

87-10 51ST AVENUE OWNERS CORP.

1            MR. LUCKMAN:  Gerard Luckman, SilvermanAcampora,

2    counsel to Mr. Jacinto Chua.

3            THE COURT:  Thank you.

4            MR. MILLER:  Joel Miller, Miller & Miller, LLP,

5    counsel for sixty-eight shareholders.

6            MS. MARTIN:  Marylou Martin representing the United

7    States Trustee.

8            MR. RACHMUTH:  Paul Rachmuth, Gersten Savage, attorney

9    for Mr. Clausell, who is here in the courtroom, per your order.

10           THE COURT:  All right.  Thank you.

11           THE CLERK:  Judge, Mr. Tabachnik was supposed to be on

12   the phone.

13           THE COURT:  On the telephone?

14           MR. MEADVIN:  This is Michael Meadvin, Your Honor,

15   chairman of the official committee of unsecured creditors.

16           THE COURT:  Thank you.  I appreciate your calling in.

17   Also, Mr. Levine?

18           OPERATOR:  Your Honor, there's no appearance on

19   CourtCall from Eric Levine.

20           THE COURT:  I'm sorry?

21           OPERATOR:  There is no appearance on CourtCall from

22   Eric Levine.

23           THE CLERK:  Judge, Mr. Levine was on, only if he was

24   needed.

25           THE COURT:  All right.  So he's available?

1          THE CLERK:  He's available if needed.  Mr. Tabachnik,

2    I'm going to see if I can get him back on line.

3          THE COURT:  All right.  Do we have Mr. Tabachnik or

4    Mr. Stone?

5          MR. TABACHNIK:  Your Honor, Douglas Tabachnik -- good

6    afternoon -- here on the telephone.  Thank you very much for

7    allowing me to appear by telephone this afternoon.

8          THE COURT:  Thank you.

9          MR. MAGALIFF:  Your Honor, Mr. --

10         THE COURT: Mr. Stone?

11         MR. MAGALIFF:  -- he sent me an e-mail.  I don't think

12   he realized that he was supposed to arrange for Eagle or

13   CourtCall, but he is available by cell phone if he needs to be

14   reached.

15         THE COURT:  There may be a way that we can arrange for

16   him to call in.

17         All right.  That takes care of the appearances, I

18   think.  Mr. Magaliff, could you bring me up to date?  We have

19   two matters on the calendar today.  They were both scheduled as

20   an urgent matter at the request of the parties and on the

21   determination of the Court that urgency was appropriate.  And

22   so here we are.  Let me hear from you.

23         MR. MAGALIFF:  Thank you, Your Honor.  Last time we

24   were here, I began by telling you the bad news.  Today I'm

25   going to begin by telling you the good news.  All of the

87-10 51ST AVENUE OWNERS CORP.

1    parties, including the three principals of Empire, have signed

2    the settlement agreement.

3          THE COURT:  All right.

4          MR. MAGALIFF:  And the seven board members, the three

5    Empire principals and the four resident board members, have

6    also signed their resignations as members of the board of

7    directors to become effective when the agreement is approved

8    under the 9019 motion to be heard.

9          THE COURT:  Okay.  That is good news.

10         MR. MAGALIFF:  What I would like to do is have each of

11   the three empire shareholders take the stand and let me ask

12   them about half a dozen or a dozen questions to confirm that

13   they understand what they've signed and that they are complying

14   with the order to show cause that was entered and that they

15   will consent to allow the property manager to collect all of

16   the rent, so we have no issues after today.

17         THE COURT:  I think it may be appropriate to make that

18   record.  And we'll be -- we'll do that promptly.  What else do

19   you think it's helpful for the Court to know from the debtor's

20   perspective?

21         MR. MAGALIFF:  Well, the only other thing from the

22   debtor's perspective, Your Honor, which pertains to the

23   monetary side of the order to show cause and the collection of

24   rents and the turnover of rents by Empire, Mr. Aloe can speak

25   to.  But very briefly, Your Honor, we have received

87-10 51ST AVENUE OWNERS CORP.

1   approximately 50,000 dollars plus from May's rents.  Empire has

2   in its bank account approximately 72,000 dollars from May

3   collections, which are going to be turned over.  And today Mr.

4   Peterson turned over to Mr. Lamb (ph.) checks that they have

5   received so far for June's rent, that have not been cashed.

6          They have also turned over what is represented to be

7   all of the records that they were directed to bring, including

8   the ledgers for the rent collections to account for the rents,

9   at least for the period May and June, which was the subject of

10   the settlement agreement.  And again, Mr. Aloe can speak more

11   to that.

12          So we can either proceed to that, or I can make the

13   record which shouldn't take more than ten or fifteen minutes;

14   whatever you prefer.

15          THE COURT:  All right.  I would like to hear from

16   others who would like to be heard with respect to the two

17   matters on the Court's calendar, briefly.  There's no need to

18   add to the filings or to reiterate that which has been said by

19   others.

20          It is very good news, indeed, that we are continuing

21   down the track that the parties worked so hard to establish.

22   And that will be, I think, our principal priority today.  It

23   addresses the question posed by the second -- excuse me, first

24   order to show cause on the Court's calendar, concerning

25   collection of rent and execution of the settlement agreement

87-10 51ST AVENUE OWNERS CORP.

1    and releases and the like.

2            Mr. Aloe, let me go to you next.

3            MR. ALOE:  Your Honor, as has been accurately

4    reflected, the three principals of Empire have signed the

5    settlement agreement.  As Your Honor is aware, there had been

6    retention of another firm.  I was -- I learned that that firm

7    had received a 50,000-dollar retention from Empire.  I had a

8    discussion with that firm, because it did appear that those

9    monies came from rents.  And they had agreed to return that

10   50,000 dollars and place it in my firm's escrow account.

11           That has happened.  Empire has an additional 7,200 in

12   its account --

13           UNIDENTIFIED SPEAKER:  7,200?

14           MR. ALOE:  7,200.

15           UNIDENTIFIED SPEAKER:  I thought you said 72,000.

16           MR. ALOE:  No, 7,200.

17           UNIDENTIFIED SPEAKER:  We have a problem.

18           MR. ALOE:  And they have checks --

19           THE COURT:  I'm going to remind the parties that the

20   person to whom -- that statements of counsel should be directed

21   to the Court.  We'll take a break if we need one, but I do want

22   to proceed to make the record that has been identified.

23           Mr. Aloe, please continue.

24           MR. ALOE:  We have checks -- there were some checks

25   that were received for the month of June.  Those were turned

87-10 51ST AVENUE OWNERS CORP.

1    over to Mr. Lamb.  It was -- the parties asked that they're

2    made out to Empire; that they would go through my firm's escrow

3    account; and then we would write out a check to Mr. Lamb, which

4    we are prepared to do.

5          They have produced their ledger and their collections.

6    They've provided a copy of their bank statement and all the

7    records that were requested by the Court.  And they are

8    certainly prepared to fully cooperate and abide by the terms of

9    the order and not in any way interfere with the property

10   manager's collection of rents for -- further collections of

11   rent.

12         THE COURT:  All right.  So it sounds like much of the

13   relief that was sought may well be consented to.  I think that

14   will make this a much more expeditious proceeding and a much

15   more -- even more productive one.

16         All right.  Mr. Spizz?

17         MR. SPIZZ:  Yes, Your Honor.  Thank you very much.

18   Your Honor, I'm very pleased that the Empire representatives

19   have decided to sign the agreement which they agreed in open

20   court to sign.

21         One thing that must -- if I could make a -- must come

22   out today is that besides -- there must be an order entered, I

23   would ask, that makes it clear, besides their not interfering

24   with the property manager's collection of rent, that it -- the

25   tenants are waiting for some directive from the Court as to

87-10 51ST AVENUE OWNERS CORP.

1    where the money should be paid.  And we would ask that, at the

2    end of this proceeding, that an order be entered that directs

3    that all tenants and subtenants of the building and residents

4    pay whatever rent is owed to the outside property manager, so

5    the tenants now have clarity as to where the money should be

6    paid.

7         As I said, I'm heartened that they have signed the

8    agreement.  What I'm upset about, Judge, is that the

9    collections we know on the rent are over 100,000 dollars a

10   month.  We're going to -- I guess the representatives are going

11   to take the stand in a few minutes.  They represented that all

12   of the June rents that they've collected, which is about 12,800

13   dollars, have been turned over.  And that represents all of the

14   June rents.  And if they take the stand and they swear to that

15   under oath, we'll accept that, Judge.

16        But the May rents, 50,000 dollars is coming back from

17   Mr. -- from the law firm, and 7,200 dollars, apparently is in a

18   bank account.  That leaves a shortage of at least 50,000

19   dollars.

20        And it -- there must be a disposition of how that

21   money is going to be accounted for and how that money, which

22   under the agreement, all May and June rents were supposed to be

23   turned over, is going to be paid to the co-op, pursuant to the

24   agreements.  And the mere signing of the agreement is only the

25   first step.  The accounting for and the paying over of the

87-10 51ST AVENUE OWNERS CORP.

1   missing funds is the second step of this proceeding, Your

2   Honor.

3        MR. ALOE:  Your Honor, I just want to clarify.  There

4   were payments made by Empire to the debtor.  So I believe that

5   will account for -- we're hopeful it will account for the

6   difference in terms of the --

7        THE COURT:  Well, we have the opportunity, with that

8   testimony to make a clear record.  I think that'll be very

9   useful.

10        MR. ALOE:  And one thing I did forget to add when I

11   spoke; and that is that Mr. -- the three principals of Empire,

12   they asked me, in particular, Mr. Sheehan, who had not appeared

13   and who undertook certain actions which caused all this to

14   happen, they asked me to convey to the Court and to the parties

15   their apologies for what has occurred.

16        THE COURT:  I appreciate that.  Thank you.

17        All right.  Next?  We're going to work our way down

18   the room.  Mr. Weinstein, let me hear from you.

19        MR. WEINSTEIN:  Just to add one thing to what the

20   committee's counsel discussed about the May and June rents.

21   Your Honor's order required that all original documents --

22        THE REPORTER:  Excuse me.  Can you speak closer to the

23   mic?

24        THE COURT:  Let's get you a microphone, especially

25   because we do have parties on the telephone also.

87-10 51ST AVENUE OWNERS CORP.

1          MR. WEINSTEIN:  Yes.

2          THE COURT:  Thank you.

3          MR. WEINSTEIN:  Your Honor's order to the principals

4    of Empire and to Empire required that, to this hearing, all

5    original documents that concern, reflect, refer, or relate to

6    the collection of rents since May 1st, be produced.  And this

7    may be the subject of the hearing.  And what it appears that we

8    have are copies of checks and a deposit -- and deposit tickets,

9    and one account statement detail that does not appear to be the

10   actual bank statement.  And what we really are missing is what

11   happened to the money.

12         So we're seeing some deposits, but as counsel for the

13   committee has noted, there's money missing.  And the records

14   that have been produced do not show where the money rent.  And

15   Your Honor's order, I believe, required that all original

16   documents that concern, reflect, refer, or relate, was intended

17   to be comprehensive.  And I would think that Empire and its

18   principals would have known that they had to bring records so

19   that we would know where the May money went.  So --

20         THE COURT:  Well, we'll go as far as we can on the

21   most important issues, in view of the timing and circumstances

22   of scheduling this hearing.  My primary focus, and I expect the

23   parties', will be the question of the entry into the settlement

24   agreement.  It seems that may be -- may have been accomplished.

25   The question of where funds are now and where they should be --

87-10 51ST AVENUE OWNERS CORP.

1    the question of compliance with the Court's order to produce

2    documents is a matter of concern to me, because it -- like all

3    other questions concerning compliance with the Court's order,

4    not only is it important to the case proceeding in a good way,

5    but also shows the respect or lack of respect for the order

6    entered by a federal court.

7            Mr. Aloe, you may be seated.  And I will take the

8    closest look and respond in the appropriate way at the

9    appropriate time, to demonstrated, willful, noncompliance with

10   any order of this Court.  I am constrained to do that by the

11   need to preserve respect for this court and its orders, whether

12   issued by me or any other judge in this or any other federal

13   courthouse.

14           But that does not need all to be addressed today, nor

15   do I expect that it will all be addressed today.  Compliance

16   with my orders can be determined next week, the week after.

17   There are matters even more urgent to be addressed today, and

18   we shall address them.

19           All right, Mr. Luckman, may I hear from you?  You

20   don't need to add anything to what's been said.  But if you

21   have anything to add on behalf of your client, Mr. Chua, this

22   is your opportunity.

23           MR. LUCKMAN:  I'll reserve and speak later if the

24   Court doesn't mind.

25           THE COURT:  Mr. Miller, same question.  Anything to

87-10 51ST AVENUE OWNERS CORP.

1   add?

2            MR. MILLER:  Same answer, Judge.

3            THE COURT:  All right.  And Ms. Martin?

4            MS. MARTIN:  Nothing to add, Your Honor.

5            THE COURT:  All right.  Mr. Magaliff, call your first

6    witness.

7            MR. MAGALIFF:  Thank you, Your Honor.

8            THE COURT:  I'm sorry, we have counsel in the seats in

9    back, and I did not also make the rounds.  Mr. Rachmuth, let me

10   hear from you.

11           MR. RACHMUTH:  Just, Your Honor, my client has

12   appeared here, and due to a scheduling issue, I'm hoping to

13   leave here within a half hour.  If that's not going to

14   happen --

15           THE COURT:  We'd all like to leave, but I don't think

16   that it'll be in half an hour.  Thank you very much.  You may

17   be seated.

18           All right.  Call your first witness.

19           MR. MAGALIFF:  I call Erik Garcia.

20       (Witness sworn)

21           THE REPORTER:  You may be seated.  Please spell your

22   name for the record.

23           THE WITNESS:  Erik Garcia, E-R-I-K  G-A-R-C-I-A.

24           MR. MAGALIFF:  Your Honor, I've marked as Exhibit 1 a

25   copy of the fully executed settlement agreement, which I'd like

87-10 51ST AVENUE OWNERS CORP.

1    to hand to the witness.  Would you like a copy of it?

2            THE COURT:  Any exhibit that the witness is given

3    should also be provided to counsel and the Court.

4            MR. MAGALIFF:  Well, I don't have multiple copies,

5    because they just signed it today.  But I have available --

6            THE COURT:  We can make copies.  You can give that to

7    Ms. Jackson.  She can pass it to me.  We'll make copies if we

8    need to.

9    DIRECT EXAMINATION

10   BY MR. MAGALIFF:

11   Q.   Mr. Garcia, I'm showing you a copy of -- I've handed you a

12   copy of Debtor's Exhibit 1, which is the settlement agreement.

13   Do you recognize that document?

14   A.   Yes, I do.

15   Q.   And I've turned it to the page that has signatures on it.

16   Can you identify your signature on that page?

17   A.   Yes.  It's the second one.

18   Q.   The second one on the left-hand column?

19   A.   Correct.

20   Q.   Under the signature block for board members?

21   A.   Sorry, it's the first one under the signature block for

22   board members.

23   Q.   Thank you.  And you read this agreement before you signed

24   it?

25   A.   Yes.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    You understand what the agreement says?

2    A.    Yes.

3    Q.    Do you understand what it requires Empire to do?

4    A.    Yes.

5    Q.    Do you understand what Empire's obligations under the

6    agreement are?

7    A.    Yes.

8    Q.    Do you understand your own personal obligations, such as

9    they exist under the agreement?

10    A.    Yes.

11    Q.    Were you influenced in any way not to sign the agreement?

12    A.    Was I influenced in any way not to sign the agreement?

13    Well there was disagreement amongst the three of us.

14    Q.    But you've signed the agreement of your own volition?

15    A.    Yes, of course.

16    Q.    Nobody coerced you into signing it?

17    A.    No.

18    Q.    Correct?

19    A.    No.

20    Q.    Okay.  Now, are you familiar with the order to show cause

21    that was entered on Friday, June 1st?

22    A.    Remind me which one that is?

23    Q.    That was the order to show cause that directed Empire not

24    to interfere with the outside property manager's collection of

25    rents.

87-10 51ST AVENUE OWNERS CORP.

1    A.    Okay.

2    Q.    You're familiar with that, right?

3    A.    Yes.

4    Q.    And you know what that order to show cause provides?

5    A.    Honestly, I don't know if I've read that one.  I don't

6    remember.

7    Q.    Are you aware that the order prohibits Empire from

8    interfering with the property manager's collection of rents?

9    A.    Yes.

10   Q.    And do you agree that from today forward you will not take

11   any action to interfere with the property manager's collection

12   of rent from the Empire tenants?

13   A.    Yes, I do.

14   Q.    And do you consent to the entry by this Court of an order

15   that authorizes the property manager to be the sole person with

16   authority to collect rents from Empire's tenants?

17   A.    Yes, I do.

18   Q.    And do you agree that from this day forward you will take

19   no action whatsoever in derogation of the settlement agreement

20   that you've signed?

21   A.    Yes, I do.

22   Q.    Thank you.

23        MR. MAGALIFF:  Your Honor, I have no other questions

24   for Mr. Garcia.

25        THE COURT:  Would anyone else like to question Mr.

87-10 51ST AVENUE OWNERS CORP.

1   Garcia?

2           Mr. Spizz, come up to the podium.

3           MR. SPIZZ:  Yes.

4   CROSS-EXAMINATION

5   BY MR. SPIZZ:

6   Q.   What is your position with Empire, sir?

7   A.   Vice president.

8   Q.   Okay.  And you're a member of the board?

9   A.   Yes.

10  Q.   Okay.  Attached --

11          THE COURT:  Get back to that microphone, please.

12          MR. SPIZZ:  Yes.

13          THE COURT:  Thank you so much, Mr. Spizz.

14          MR. SPIZZ:  Yes.  Thank you, Your Honor.

15  Q.   Attached to the order to show cause that was filed is an

16  exhibit -- I don't know if you have a copy -- if I could hand

17  it to the witness -- of a check in the amount of 60,000 dollars

18  from Empire State Conglomerates payable to 87-10, which was

19  represented to be payment of part of the May rents -- May

20  rents.  Are you familiar with that payment?

21  A.   No.

22  Q.   You're not?  Okay.

23  A.   I don't know anything --

24          MR. ALOE:  Your Honor, I'm going to object.  I think

25  that the nature of this was an allocution of a settlement

87-10 51ST AVENUE OWNERS CORP.

1    agreement, and this is going outside of an allocution.

2          THE COURT:  Overruled.

3          MR. SPIZZ:  With the Court's permission, if I could

4    have this document marked as -- we'll call it Debtor's Exhibit

5    1 for identification.

6          THE COURT:  Well, I don't think -- well, we have

7    Exhibit 1 for identification.  Nothing's been offered.  We have

8    number 2 for identification.  You can pass it to my -- you can

9    pass it to my law clerk, who will return to her seat for the

10   moment and will pass it to me, in the absence of our courtroom

11   deputy, who is making copies of your prior exhibit.

12        (Check for 60,000 dollars was hereby marked for

13   identification as Debtor's Exhibit 2, as of this date.)

14         MR. SPIZZ:  Thank you.

15         THE COURT:  All right.  Please proceed.

16   Q.   I'll show you a document, sir, that's been marked as

17   Exhibit 2 -- Debtor's Exhibit 2 for identification and ask if

18   you have seen this document before?

19   A.   No, I haven't.

20         MR. SPIZZ:  Okay.  I have no further questions of this

21   witness, Your Honor.

22         THE COURT:  We can pass -- give these copies to Mr.

23   Magaliff; it's his documents.

24         THE CLERK:  Mr. Magaliff.

25         MR. MAGALIFF:  Yes.

87-10 51ST AVENUE OWNERS CORP.

1          THE CLERK:  These are yours.

2          THE COURT:  Mr. Magaliff, we're providing you with

3     copies of the document that was marked for identification as

4     Exhibit 1.

5          Would anyone else like to question Mr. Garcia?

6          MR. WEINSTEIN:  Yes, briefly, Your Honor.

7          THE COURT:  All right.  Go ahead, Mr. Weinstein.

8     CROSS-EXAMINATION

9     BY MR. WEINSTEIN:

10    Q.   Mr. Garcia, do you still have in front of you Debtor's

11    Exhibit Number 2?

12    A.   Is that the settlement agreement?

13    Q.   No.  That's the check.

14    A.   No, I don't --

15    Q.   All right.  I'll give you a copy.  Do you have the check

16    in front of you?

17    A.   I have a photocopy of the check.

18    Q.   Okay.  Do you see a signature there or what purports to be

19    a signature?

20    A.   Yes.

21    Q.   Do you recognize that signature?

22    A.   That is the signature of -- that's the signature of -- no,

23    I don't recognize it.

24    Q.   Who's authorized to sign the checks for Empire State

25    Conglomerates?

87-10 51ST AVENUE OWNERS CORP.

1    A.    James Sheehan.

2    Q.    Anyone else?

3    A.    Nope.

4    Q.    Is that the signature of James Sheehan?

5    A.    I don't know.  That's not the one I normally see.

6    Q.    All right.  Is it accurate that Empire has paid a total --

7    or did pay a total of 79,735 dollars?

8    A.    I don't know.  I don't know anything about inflows and

9    outflows of cash.  It's not my job.  I don't know anything

10   about it.

11   Q.    Okay.  Where are the corporate records of Empire State

12   Conglomerates?

13   A.    I don't know.  I would assume they're with our accountant.

14   Q.    And what is your accountant?

15   A.    Shashi B. Malik.

16   Q.    Could you spell that, please?  As best you can.

17   A.    S-H-A-S-H-I B. M-A-L-I-K.

18   Q.    Where is his -- it's a male, correct?

19   A.    Yes.

20   Q.    He's a male?

21   A.    Right.

22   Q.    Where is his office located?

23   A.    In -- it's on Long Island; I'm trying to remember the name

24   of the city.  Baldwin, I think.

25            THE COURT:  I need to ask the parties on the telephone

87-10 51ST AVENUE OWNERS CORP.

1  to be sure that their phone is on mute because we're hearing a

2  lot of wind or something from one of your phones here not

3  courtroom.

4  Q.   It's in Baldwin, Long Island?

5  A.   Yes.

6  Q.   All right.  Who maintains the bank statements for Empire

7  State Conglomerates?

8  A.   I don't know.  I have nothing to do with it.

9  Q.   Have you ever seen a bank statement --

10  A.   No.

11  Q.   -- for Empire State Conglomerates?

12  A.   No.

13  Q.   How much money was collected by Empire State Conglomerates

14  relating to rent from Empire tenants --

15  A.   I don't know.

16  Q.   -- for the month of May --

17  A.   I don't --

18  Q.   -- of this year?

19  A.   I don't know.

20  Q.   Who would know?

21  A.   Paul would know.

22  Q.   Paul Peterson?

23  A.   Yes.

24  Q.   He would know?

25  A.   I don't think so.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Okay.  What payments were made by Empire to any person or

2    entity --

3    A.    I don't know.

4    Q.    -- since May 1st of this year?

5    A.    I don't know.

6    Q.    Who would know?

7          THE COURT:  I'd like to remind everyone that you need

8    to let the witness finish an answer.

9          You need to let the lawyer finish --

10         THE WITNESS:  I'm sorry.

11         THE COURT:  -- the question.  You may not know that

12   you don't know until you've heard the full question.

13         THE WITNESS:  Okay.

14         THE COURT:  Thank you.

15         MR. WEINSTEIN:  Thank you.

16   Q.    Who would know?

17   A.    James Sheehan would know, and Paul Peterson might know.

18   Q.    Now, Mr. Sheehan is the only authorized signatory for the

19   checks for Empire?

20   A.    Yes.

21   Q.    Has anyone except for Mr. Sheehan entered into financial

22   transactions with a bank for Empire?

23         MR. ALOE:  Objection.

24   A.    No, not that I know of.

25         THE COURT:  The question has been answered.  When

87-10 51ST AVENUE OWNERS CORP.

1    there's an objection, it's a good ideal to let me pause and let

2    me rule on the objection.

3              THE WITNESS:  I'm sorry.

4              THE COURT:  We'll proceed.

5    Q.   Does Empire have the ability to undertake banking

6    transactions by computer?

7    A.   I don't know.

8    Q.   Have you ever done any transactions or entered into any

9    transactions, moved money within bank accounts, for example, on

10   behalf of Empire using a computer?

11   A.   No.

12   Q.   Do you know whether Empire has that capacity to move money

13   between accounts by computer?

14   A.   I don't know.

15   Q.   Does Empire have a bank card that can with used at an ATM?

16   A.   I don't know.

17   Q.   How many bank accounts does Empire have?

18   A.   I don't know.

19   Q.   Do they have a money market account?

20   A.   I don't know.

21   Q.   Are you -- do you receive a salary from Empire?

22   A.   No.

23   Q.   Have you ever received any money from Empire at all?

24   A.   I don't know.  I've received some cash, but I don't know

25   if it was from Empire or if it was personal funds.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Was it in the form of cash?

2    A.    Yes.

3    Q.    Who gave it to you?

4    A.    Robert gave it to me.

5    Q.    Who's Robert?

6    A.    Robert Valdes-Clausell.

7    Q.    How often has he given your cash?

8    A.    Weekly.

9    Q.    Is it always in cash?

10   A.    Um-hum.

11   Q.    How much -- well, when did the cash payments begin?

12   A.    When I first got involved.

13   Q.    What was that?

14   A.    In July of 2008.

15   Q.    How often did you receive cash payments?

16   A.    At first, it was just a number of days, depending on the

17   number of days that I worked per week.  Some weeks there was

18   none; some weeks there was -- I don't remember, honestly.

19   Q.    Well, how much were you paid; what rate of paid?

20   A.    150 dollars per day.

21   Q.    And it would always be in cash, correct?

22   A.    Correct.

23   Q.    Did you receive any kind of receipt --

24   A.    No.

25   Q.    -- for that money?

87-10 51ST AVENUE OWNERS CORP.

1   A.   No.

2   Q.   Any tax documents for that money relating to that money?

3   A.   No.

4   Q.   You just received cash and no other documentation of the

5   payments to you?

6   A.   That's right.

7   Q.   Where did Robert Clausell get the cash?

8   A.   I don't know.

9   Q.   Was it his own money?

10   A.   I don't know.

11   Q.   Was it Empire's money?

12   A.   I don't know.

13   Q.   But you accepted it?

14   A.   Yes.

15   Q.   What's the total that you've been paid by Empire since you

16   began?

17   A.   I don't know, but the maximum I ever received was 450

18   dollars per week so -- but I didn't get that every week.  I

19   mean, some weeks I didn't get anything.

20   Q.   Who decided whether to pay you?

21   A.   I guess Robert decided.

22   Q.   You're an owner, aren't you, a shareholder of Empire State

23   Conglomerates, Inc.?

24   A.   Yes.

25   Q.   Mr. Clausell purports not to be an owner of Empire State

87-10 51ST AVENUE OWNERS CORP.

1    Conglomerates, Inc., correct?

2    A.    Right, yes.

3    Q.    Yet he decides how much to pay you, an owner, correct?

4    A.    Yes.  Well, he was giving me money so that I could pay my

5    rent, and he had a vested interest in the company succeeding,

6    so he wanted to help me out so that I would be able to do the

7    work for the company.

8    Q.    Was his vested interest financial?

9    A.    No, not that I know of.

10    Q.    Did Robert Clausell make any money from Empire State

11    Conglomerates, Inc.?

12    A.    Not that I know of.

13    Q.    Do you know that he didn't?

14    A.    I don't -- I don't know anything about his money.

15    Q.    Who else was paid cash by Empire -- by Robert Clausell?

16    A.    I don't have any firsthand knowledge of anybody else; I

17    can only speak for myself.

18    Q.    You didn't have any firsthand knowledge?

19    A.    Correct.  I've never seen anybody else being handed money.

20    Q.    Has anyone ever told you that they received cash?

21         MR. ALOE:  Your Honor, I'm going to object.  This

22    inquiry -- this examination started as an allocution of a

23    settlement agreement.  Questions were put as to May and June

24    rent which is the subject of the agreement.  We've gotten well

25    beyond that, and this is the first time I've seen where a

87-10 51ST AVENUE OWNERS CORP.

1    client signs a settlement agreement, walks into court and

2    effectively is being examined on the very matters in which have

3    been settled, and I think it's inappropriate, and I want to

4    lodge an objection to this continuing line of questioning.

5         THE COURT:  What's the legal basis for the objection,

6    Mr. Aloe?

7         MR. ALOE:  I think it's beyond the scope of what this

8    examination is, and there's a settlement agreement, and this is

9    some sort of examination into events well within the settlement

10   period and well beyond the period of the May and June rents.

11        THE COURT:  Mr. Aloe, when was the settlement

12   agreement signed?

13        MR. ALOE:  Today.

14        THE COURT:  The questions posed by my orders to show

15   cause seem to me sufficient to bring this within the scope of

16   an appropriate examination.  I also indicated in at least one

17   of those records that evidence would be taken.  I directed

18   documents to be brought including documenting concerning rent

19   payments.  Broadly speaking, I think witnesses' credibility is

20   always at stake as well, and I'm going to overrule the

21   objection based on each and all of those grounds.  You may be

22   seated.

23        MR. ALOE:  Thank you.

24        THE COURT:  Thank you.

25   BY MR. WEINSTEIN:

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Where would you receive these cash payments?  Where were

2    you when you received them?

3    A.    Various locations.

4    Q.    For example?

5    A.    In a car, in the office, at the building; usually -- I

6    guess usually those two.

7    Q.    Did you ever go to the bank with Robert Clausell for any

8    purpose?

9    A.    Nope.

10   Q.    Have you ever done any banking or been with anybody --

11          MR. WEINSTEIN:  Strike that.

12   Q.    Have you ever been with anyone who was engaging in banking

13   transactions at a bank for Empire?

14   A.    Nope.

15   Q.    Have you ever been to Mr. Sheehan's home?

16   A.    No.

17   Q.    Does he live in Howard Beach?

18   A.    He did; I don't know if he still does.

19   Q.    Did he move last week?

20   A.    I don't know.

21   Q.    Did you testify previously that he lived in Howard Beach?

22   A.    Yes.

23   Q.    He doesn't live in Howard Beach, does he?

24   A.    To my knowledge, he lived in Howard Beach for quite a long

25   time.  If he's moved -- if he's not there anymore, I don't

87-10 51ST AVENUE OWNERS CORP.

1    know.  I haven't seen him in a week.

2    Q.    Don't you know that he lives in Queens, in Maspeth?

3    A.    No.

4    Q.    Didn't you -- excuse me.  Didn't you know, when you

5    testified in this court previously, that Mr. Sheehan lived in

6    Maspeth?

7            MR. ALOE:  Objection.

8    A.    No, I didn't.  I don't know anything about Mr. Sheehan

9    living in Maspeth.

10            THE COURT:  Overrule the objection.

11    Q.    How many board of directors' meetings have there been for

12    Empire State Conglomerates, Inc.?

13    A.    Well, we've never called them a board of directors

14    meeting, so I guess none.

15    Q.    Have you ever seen any corporate documents for Empire

16    State Conglomerates, Inc.?

17    A.    Yes.

18    Q.    What documents have you seen?

19    A.    A document showing the ownership of the shares of the

20    company, of the three owners.

21    Q.    Where is that document?

22    A.    There's a copy of it here actually.  I think Paul Aloe

23    might have it I don't know; maybe one of them has it.

24    Q.    When you refer to "one of them", who are you speaking

25    about?

87-10 51ST AVENUE OWNERS CORP.

1    A.    Sorry.  One of my partners.

2    Q.    Mr. Peterson or Mr. Sheehan?

3    A.    Right.

4    Q.    They have the -- a corporate record showing the ownership

5    of Empire State Conglomerates, Inc., correct?

6    A.    Yes.  I just saw it a little while ago.

7    Q.    Okay.  Have you seen any other corporate documents?

8    A.    I may have.  I mean, when I first joined the company, I

9    had to sign some things, but that was four years ago, and I

10   don't remember what they were.

11   Q.    And you kept copies, correct?

12   A.    No, I don't think I did.

13   Q.    Well, I think you testified last time you were in this

14   court that you had -- that potentially, at least and likely

15   actually, your investment in Empire State Conglomerates could

16   be worth millions of dollars, correct?

17   A.    Um-hum.

18   Q.    You kept no documents showing your ownership interest in

19   Empire State Conglomerates, Inc.?

20   A.    Bad idea, right?

21   Q.    Is that your answer?

22   A.    That's my answer.

23   Q.    Is that a yes or a no?

24   A.    That's a no, I didn't.

25   Q.    All right.

87-10 51ST AVENUE OWNERS CORP.

1           THE COURT:  Mr. Weinstein, we do have two more

2    witnesses and some limitations of time --

3           MR. WEINSTEIN:  Yes.

4           THE COURT:  -- because of the requirements of the

5    courthouse.

6           MR. WEINSTEIN:  Thank you.

7           THE COURT:  So I'm going to ask you to focus on the

8    things that are most important, understanding that we'll

9    continue on other matters as if and when we need to.

10           MR. WEINSTEIN:  Yes.  I'll ask one further question,

11   Your Honor.

12           THE COURT:  Thank you.

13   Q.   Who received money from the May rents paid to Empire State

14   Conglomerates, Inc.?  What received that money?

15   A.   I don't know.

16           MR. WEINSTEIN:  Thank you.

17           THE COURT:  All right.  Just as a matter of

18   housekeeping, I have before me the settlement agreement and

19   mutual release document that was referred to for identification

20   as Exhibit 1; I have the one bearing blue ink signatures.  I

21   would like to provide this back to the appropriate counsel and

22   get a photocopy of this, not of the original signed version

23   here on the bench.  I'll pass it to my deputy for that

24   exchange.

25           Mr. Magaliff, I think this is probably to you.

1          MR. SPIZZ:  Judge, can I just ask one or two just

2   follow-up questions.

3          THE COURT:  Haven't you questioned already?  I'd like

4   to know if anyone else would like to question the question in

5   the first instance, and then I'd like to observe some order

6   here.  All right?

7          Mr. Luckman, would you like to question the witness?

8          MR. LUCKMAN:  No, Your Honor.

9          THE COURT:  Would anyone else like to question the

10  witness?  All right.

11         MR. SPIZZ:  I'll be very brief, Your Honor; I promise.

12  I know the time constraints.  I just want to follow up on a

13  line of questioning that counsel just was asking.

14         THE COURT:  All right.  Without objection, you can

15  come back to the podium.  Do be sure when you're speaking --

16         MR. SPIZZ:  Thank you.

17         THE COURT:  -- all of you, and I'm doing the same, to

18  use those microphones.  Thank you very much.

19         MR. ALOE:  Your Honor, I'd note an objection.  My

20  position is there's a clause in this, there are releases,

21  there's a paragraph 13 about future actions.  These questions

22  that are being asked which appear to be aimed at trying to

23  trigger some sort of --

24         THE COURT:  There's no question pending, so it's not

25  appropriate to object to a question.  It was more the order of

87-10 51ST AVENUE OWNERS CORP.

1   questioning.

2          MR. ALOE:  I'm objecting to further questionings

3   outside the allegation.

4          THE COURT:  All right.

5          MR. ALOE:  My position is that the questions that have

6   been asked and are being asked is a violation of the settlement

7   agreement that was just signed.

8          THE COURT:  All right.  Mr. Aloe, would you like to --

9   to the extent that you would like to question the witness

10  before Mr. Spizz, I will allow that.  That was what my inquiry.

11  No.  Waiving that.  All right.

12          I recall, in the context that you were called, it

13  would be appropriate perhaps, Mr. Aloe, if he wish to question

14  you, or for your counsel, if you have separate counsel here.

15  Do you, Mr. Garcia?

16          THE WITNESS:  No.

17          THE COURT:  All right.  So Empire's counsel has waived

18  questioning.

19          Mr. Spizz, that takes us back to this side of the

20  table.

21          MR. SPIZZ:  Thank you, Your Honor.

22  REDIRECT EXAMINATION

23  BY MR. SPIZZ:

24  Q.   You indicated that you've been with the company, Empire,

25  for four years, right?

87-10 51ST AVENUE OWNERS CORP.

1   A.   That's correct.

2   Q.   What are you duties and responsibilities?

3   A.   My duties have been to deal with the eighty-one tenants,

4   write most of the communications to the tenants, to the

5   attorneys.  I deal with five or six law firms, the housing

6   court; I do all the appearances in housing court, small claims

7   court, state court, go to the registrar's office in Queens,

8   state court in Nassau County for collections, mostly that,

9   mostly the legal and the tenants.

10  Q.   And now, you said since you've been employed you've been

11  getting weekly payments from Mr. Clausell; is that correct?

12  A.   Not always weekly.

13  Q.   Okay.  And the maximum is about 150 dollars a day; maximum

14  you've ever gotten in one week was 450 dollars, correct?

15  A.   Correct.

16  Q.   Okay.  And is it your testimony -- does Mr. Clausell have

17  any affiliation whatsoever with Empire, to your knowledge?

18  A.   No, he's -- no.

19  Q.   No.  But he was paying you for services rendered to

20  Empire?  Is that your understanding?

21  A.   Yes.

22  Q.   Okay.  And is it your testimony under oath today that you

23  have no idea what the source of funds were that Mr. Clausell

24  was paying you?

25  A.   I can speculate.  I don't know for sure.

87-10 51ST AVENUE OWNERS CORP.

1   Q.   But you never asked, you never inquired, say --

2   A.   Well, I did, and I got different answers, so I'm not sure

3   which one was the correct answer.

4   Q.   Well, what -- could you tell us what answers you did get?

5   A.   Well, first --

6   Q.   You got your answers from who?

7   A.   From Robert.

8   Q.   Okay.  What were the answers?

9   A.   Well, the first answer was that -- my understanding was at

10  first that it was coming from him.  Then, at some point, he

11  told me that it was -- or he implied; I don't know if he ever

12  told -- he may have told me that it was coming from Empire.

13  Then he told me it was coming from him again.  So I really

14  don't know where it was coming from.

15  Q.   Do you want us to believe that Mr. Clausell paid you out

16  of his own pocket for services that you rendered to Empire of

17  which Mr. Clausell has no affiliation?

18  A.   I don't want you to believe anything; I'm answering your

19  question as best I can.

20  Q.   But is that statement I just made correct, based on your

21  testimony?

22  A.   Yes.  He's not an officer of the company; he's not an

23  employee of the company.

24  Q.   Does he do any work for the company?

25  A.   He advise -- well, when he was the property manager, he

87-10 51ST AVENUE OWNERS CORP.

1   would rent our apartments for us.  He would show people the

2   apartments.

3   Q.   Did he get compensated for that?

4   A.   He got paid as the property manager.

5   Q.   By Empire?

6   A.   No, his salary from 87-10.

7   Q.   Oh, I see.

8   A.   But he did that for the previous shareholder as well.

9   Q.   Okay.

10   A.   That was part of his job.

11   Q.   And when was the last time you got a payment of cash from

12   Mr. Clausell?

13   A.   Last Friday.

14       MR. SPIZZ:  No further questions.

15   RECROSS-EXAMINATION

16   BY MR. MAGALIFF:

17   Q.   Mr. Garcia, one more question, and then I think I'll be

18   done.  Were you asked to do anything by Mr. Clausell in return

19   for the cash payments?

20   A.   I was asked to work for Empire.

21   Q.   Were you asked to delay signing the settlement agreement?

22   A.   Was I asked --

23   Q.   Let me rephrase the question.  Did he ask you not to sign

24   the settlement agreement?

25   A.   I don't think so.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Did he ever suggest to you, Mr. Clausell, that it would

2    not be in your interest or Empire's best interest to sign the

3    settlement agreement?

4    A.    I don't think he ever put it in those words.  I know that

5    he thought it would be a better idea if we sold the apartments

6    to a buyer so that it would -- because he was concerned about a

7    tax issue with the -- with 87-10 taking ownership of the

8    seventy-nine apartments, that would be a violation of IRS-216.

9    So I think he -- he told me it would be a better idea, but he

10   didn't specifically tell me not the sign the settlement

11   agreement.

12   Q.    Did Mr. Clausell ever suggest to you that Empire should

13   not allow the tenants to pay their rents to the property

14   manager?

15   A.    No.

16   Q.    Thank you.

17            MR. MAGALIFF:  I have no other questions, Your Honor.

18            THE COURT:  All right.  I think everyone has

19   questioned both initially and then following the waiver of

20   questioning by Empire's counsel.

21            So I think I have just one or two questions for you to

22   clarify my understanding of your testimony.  You indicated in

23   your testimony a reference to "one of my partners".  What is

24   the partnership to which you refer.

25            THE WITNESS:  My partners in the -- the other

87-10 51ST AVENUE OWNERS CORP.

1    principals of Empire.

2            THE COURT:  All right.  Do you have any other business

3    ventures with these partners?

4            THE WITNESS:  No.

5            THE COURT:  All right.  You are excused.  Thank you

6            THE WITNESS:  Thank you.

7            THE COURT:  Mr. Magaliff, call your next witness.

8            MR. MAGALIFF:  We call Paul Peterson.

9            Your Honor, in the interest of time and the primary

10   subject of today's hearing, I'm going to limit my questions

11   just to the matters in the order to show cause.

12           THE COURT:  All right.

13           You can swear the witness.

14       (Witness sworn)

15           THE CLERK:  You may be seated.  State and spell your

16   name for the record.

17           THE WITNESS:  It's Paul Peterson, P-A-U-L

18   P-E-T-E-R-S-O-N.

19   DIRECT EXAMINATION

20   BY MR. MAGALIFF:

21   Q.   Mr. Peterson, what's your address?

22   A.   231 East 96th Street, New York, New York.

23   Q.   ZIP code?

24   A.   10128.

25   Q.   Is there an apartment number?

87-10 51ST AVENUE OWNERS CORP.

1    A.    2FW.

2    Q.    2FW?

3    A.    Yeah.

4    Q.    Thank you.  In front of you on the witness stand is what's

5    been marked as Debtor Exhibit 1 which is a copy of the

6    settlement agreement --

7    A.    Um-hum.

8    Q.    -- and mutual releases.

9    A.    Um-hum.

10   Q.    Have you seen this document before today?

11   A.    Yes.

12   Q.    All right.  On the page of signatures that's open in the

13   left-hand column under "Members of the Board of Directors of

14   87-10 51st Avenue Owners, Corp.", it should say the second

15   signature down, "Paul Peterson"; is that your signature?

16   A.    Yes, it is.

17   Q.    And you signed this document?

18   A.    Yes, I did.

19   Q.    And did you read the document before you signed it?

20   A.    Yes, I did.

21   Q.    Do you understand what the document provides?

22   A.    Yes, I do.

23   Q.    Do you understand what Empire's obligations under this

24   agreement are wanted to prove by the bankruptcy court?

25   A.    Yes, I do.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Do you understand whatever personal obligations you may

2    have under this agreement when it's approved?

3    A.    Yes.

4    Q.    And did you also sign a resignation as a member of the

5    debtor's board of directors to be effective when the settlement

6    agreement is approved?

7    A.    Yes, I did.

8    Q.    Did anybody influence in any way your decision to sign

9    this agreement?

10    A.    No, they did not.

11    Q.    And you signed this agreement of your own free will?

12    A.    Yes, I did.

13    Q.    And you had the opportunity to consult with counsel before

14    you signed the agreement?

15    A.    Yes, I did.

16    Q.    And you're comfortable that there has been no undue

17    pressure brought upon you to sign this agreement; is that

18    correct?

19    A.    Correct.

20    Q.    Did anybody try to influence you not to sign this

21    agreement?

22    A.    No.

23    Q.    Okay.  Now, are you familiar with the order to show cause

24    that was signed on Friday, June 1st?

25    A.    Yes.

87-10 51ST AVENUE OWNERS CORP.

1   Q.   And are you familiar with the fact that the order to show

2   cause prohibits Empire from interfering in any way with the

3   property manager's collection of rents?

4   A.   Yes, I do.

5   Q.   Did you ever try in any way to interfere with the property

6   manager's collection of rents?

7   A.   I had sent out a letter to the building to do that because

8   my understanding was that because the agreement hasn't been --

9        MR. ALOE:  We can't hear you, sir.

10       THE COURT:  Can you pull that microphone up just to

11   make sure we're making a good record.  Thank you so much.

12       THE WITNESS:  Excuse me for a second.

13       THE COURT:  Take your time to get a cup of water.

14   A.   I'm sorry.  Please repeat your question.

15   Q.   I said, did you ever make any attempt to interfere with

16   the property manager's collection of the rents.

17   A.   Yes.  I had mistakenly sent out a letter directing them to

18   send the rents to Empire.

19       (Letter dated May 31, 2012 was hereby marked for

20   identification as Debtor's Exhibit 3, as of this date.)

21   Q.   Mr. Peterson, I've marked as Debtor Exhibit 3, a copy of a

22   letter dated May 31, 2012.  I'm going to hand it to you.

23   A.   Um-hum.

24       MR. MAGALIFF:  And here's a copy for Your Honor.

25       THE COURT:  You can give it to my deputy, please.

87-10 51ST AVENUE OWNERS CORP.

1    Thank you.

2    Q.    Mr. Peterson, take a look at Debtor Exhibit 3, please.

3    A.    Um-hum.

4    Q.    Is this the letter that you're referring to?

5    A.    Yes, it is.

6    Q.    And you said that you mistakenly sent this out.  Why was

7    it a mistake?

8    A.    Because I was under the understanding that we hadn't

9    officially signed the official agreement, that it was still

10   okay to do so.

11   Q.    On what basis did you have that understanding?

12   A.    Because the final document was not signed.

13         (Letter dated May 14, 2012 was hereby marked for

14   identification as Debtor's Exhibit 4, as of this date.)

15   Q.    Mr. Peterson, I've marked as Debtor Exhibit 4 a copy of a

16   letter dated May 14, 2012, addressed to the Honorable Elizabeth

17   S. Strong, in the bankruptcy court on the letterhead of Emmet

18   Marvin & Marvin, LLP.  Have you seen this before today?

19   A.    Yes, I have.

20   Q.    Would you please turn to page 2 of the letter, paragraph

21   5.

22   A.    Okay.

23   Q.    Would you read that into the record, please.

24   A.    It says, "The debtor's outside property manager, OPM,

25   Jeffrey Lim," and it says, "Designee shall have the right, as

87-10 51ST AVENUE OWNERS CORP.

1    of May 11, to collect all rents from Empire units directly.

2    Empire shall not collect any rents from the tenants of Empire,

3    and it shall immediately transfer all funds held in any bank

4    account or otherwise paid as rent from tenants of Empire units

5    to the OPM.  After the effective date, Empire may collect runts

6    on the Empire retained units but shall continue to owe and pay

7    maintenance on the other similar charges owed by the debtor

8    shareholders with respect to the Empire retained units.

9    Q.    Thank you.  Now turn to the last page of that letter.  Do

10   you see where it says "confirmed Empire State Conglomerates" --

11   A.    Um-hum.

12   Q.    -- "by Erik Garcia"?

13   A.    Um-hum.

14   Q.    You have to say "yes" or "no".

15   A.    Yes, I do.

16   Q.    And were you present in court when this agreement was put

17   on the record on May 11th?

18   A.    Yes, I was.

19   Q.    And you know that Erik Garcia signed this, correct?

20   A.    Yes, I do.

21   Q.    Now, the paragraph you just read into the record says that

22   Empire won't take any action to interfere with the collection

23   of rents by the outside property manager after May 11th,

24   correct?

25   A.    Correct.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    And the date of your letter is what?

2    A.    The 31st.

3    Q.    May 31?

4    A.    Yes.

5    Q.    And did anybody advise you to send this letter?

6    A.    Prior --

7    Q.    You have to talk into the microphone, please.

8              THE COURT:  You need to pull that microphone up.

9    There's a question pending.  Unless you have an objection, you

10   should be seated.

11             MR. ALOE:  The concern is that --

12             THE COURT:  I don't want to hear a concern, Mr. Aloe.

13   If you have an objection to the question, you may state it on

14   the record.  I'm very concerned about coaching here.

15             MR. ALOE:  I object to the extent it calls for

16   attorney-client communications.

17             MR. MAGALIFF:  Fair enough.

18   Q.    Let me ask you this:  did your attorney give you any

19   advice before you sent this letter?

20             MR. ALOE:  I object --

21             MR. MAGALIFF:  It's just a question --

22             THE COURT:  And you should answer that question "yes"

23   or "no".

24             MR. MAGALIFF:  That's all I'm asking for.

25   A.    Yes.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Thank you.  As you sit here today, having signed the

2    settlement agreement and mutual releases --

3    A.    Um-hum.

4    Q.    -- do you repudiate entirely the instructions given in

5    this letter that we've marked as Debtor Exhibit 4?

6    A.    I'm sorry.  Repeat that or put it in simpler terms.

7    Q.    Now that you've signed the settlement agreement --

8    A.    Yes.

9    Q.    -- do you rescind --

10   A.    Yes.

11   Q.    -- and repudiate the instructions in this letter?

12   A.    Absolutely.

13   Q.    Now, Mr. Peterson, is that your signature on that letter?

14   A.    Yes.

15        MR. MAGALIFF:  Your Honor, I'd like to move for the

16   admission into evidence of the letter that's been marked for

17   identification as Debtor 4.

18        THE COURT:  4 or 3?  I'm sorry.  What exhibit number?

19   I noted 3, but I could be off.

20        MR. MAGALIFF:  I'm sorry.  Debtor 3.  It was marked,

21   and I'd like to move for its admission.

22        THE COURT:  Any objection?

23        Without objection, the one-page letter on the

24   letterhead of Empire State Conglomerates dated May 31st, 2012,

25   and signed by Paul Peterson, President, will be received in

1    evidence as Exhibit 3.

2        (Letter dated May 31, 2012 was hereby received into

3    evidence as Debtor's Exhibit 3, as of this date.)

4        MR. MAGALIFF:  Thank you.

5    Q.    Now, Mr. Peterson, as you sit here today, do you agree

6    that you will not take any action to interfere with the

7    collection of rents from Empire's tenants by the property

8    manager?

9    A.    Yes.

10    Q.    And you will not take any action individually or on behalf

11    of Empire; is that correct?

12    A.    Correct.

13    Q.    And you agree that from today forward only the property

14    manager or other person authorized by the board of directors or

15    the court may collect the rents?

16    A.    May I make a clarification or ask a question?

17    Q.    Sure.

18    A.    My understanding is because of the agreement we do get to

19    retain two apartments.  I believe we should be able to collect

20    the rent on those two apartments, correct?

21    Q.    Without getting into what the agreement says.

22    A.    Okay.  I got it.  Okay.  I'm just -- in general?

23    Q.    Yes.

24    A.    Yes.

25    Q.    Okay.  Thank you.  And do you agree that the court --

 1   would you consent to the entry of an order by the court to the

 2   effect that only the property manager can collect the rents

 3   from the Empire tenants other than as provided in the

 4   settlement agreement?

 5   A.   Correct.

 6   Q.   Thank you.  Now, turning to the second issue in the order

 7   to show cause, which were the rents and the records, with

 8   respect to the May rent -- well, let me back up.  Is it true

 9   that you are the person at Empire who is responsible for the

10   finances?

11   A.   I am the person that produces all of the bills for the

12   company.

13   Q.   You're the person --

14   A.   I produce the invoices and do things for that, yes.

15   Q.   And are you primarily responsible for the banking?

16   A.   Mr. Sheehan takes care of the banking.

17   Q.   Who writes checks?

18   A.   Mr. Sheehan writes the checks.

19   Q.   Do you know how much was collected in May rents from

20   tenants in Empire's units?

21   A.   Approximately 104,000 dollars.

22   Q.   Of that 104,000 dollars, do you know how much was paid to

23   the co-op?

24   A.   I do not.

25   Q.   Do you know how much of that 104,000 dollars is going to

1    be turned over to the property manager on behalf of the co-op?

2    A.    From what my understanding is, it's what is in the bank

3    accounts -- the two bank accounts, which is like 7,200 dollars

4    plus the 50,000.  It's in --

5    Q.    7,200 plus the 50,000?

6    A.    Um-hum.

7    Q.    But you don't know how much has been paid to the co-op so

8    far for Empire's obligations in May, correct?

9    A.    I would have to check -- I would have to check.

10         MR. SPIZZ:  Your Honor, can I ask that the witness

11   speak a little louder.  I'm having trouble hearing.

12   A.    I would have to check -- I would have to check.

13   Q.    Do you have any idea?

14   A.    I believe there's two outstanding things that were done

15   for 15,000 dollars each.

16   Q.    So approximately 30,000 dollars --

17   A.    30,000, um-hum.

18   Q.    -- was turned over to --

19   A.    Yes.

20   Q.    -- or spent on behalf of the debtor -- let me finish the

21   question, please.

22   A.    Sorry.

23   Q.    So approximately 30,000 dollars was turned over to the

24   debtor or spent on behalf of the debtor?

25   A.    Yes.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Do you know if any money of the 104,000 dollars collected

2    in May was spent anywhere else?

3    A.    There was a retainer done for prior counsel, for Mr.

4    Levine, out of that.

5    Q.    Mr. Levine?

6    A.    Um-hum.

7    Q.    So he received part of that 104,000 dollars?

8    A.    He would receive part of that money.

9    Q.    Was anyone money spent anywhere else?

10    A.    I don't have it in front of me, so I can't say.

11    Q.    Was any money give to Robert Valdes-Clausell?

12    A.    Not that I know of.

13    Q.    Was any money paid to Mr. Garcia?

14    A.    Not that I know of.

15    Q.    Did you take a salary?

16    A.    Not that I know of.

17    Q.    Not that you know of?

18    A.    Not -- I did not.

19    Q.    Did Mr. Sheehan get a salary?

20    A.    Not that I know of.

21    Q.    Did you turn over to the property manager all of the June

22    rents that had been collected?

23    A.    Yes.

24    Q.    Are there any rents that have been collected in June that

25    you haven't turned over?

87-10 51ST AVENUE OWNERS CORP.

1    A.    There may be some in the box as of today.  I did not go to

2    the mailbox today.

3    Q.    And you will turn those over to the property manager?

4    A.    Absolutely, and anything going forward.

5    Q.    Are there any rents from any of Empire's tenants from May

6    that have not yet been paid, to your knowledge?

7    A.    I'm sorry.  Rephrase the question, please.

8    Q.    Yes.

9         THE COURT:  May I ask you to stay close to the

10   microphone.

11        THE WITNESS:  I'm sorry.  Rephrase the question.

12        THE COURT:  I think it will make a better record.  It

13   will be easier for everyone including the Court to hear your

14   testimony.

15        THE WITNESS:  Okay.  Rephrase the question, please.

16   Q.    Do any of your tenants owe rent for May?

17   A.    There were approximately -- I'd have to have the sheet,

18   but there were approximately six or seven that had not paid.

19   Q.    And the six or seven that have not been paid, are they

20   identified in the records that you've produced?

21   A.    Yes.

22   Q.    Okay.  Now you were asked -- or actually you were ordered

23   in one of the order to show cause to bring with you today all

24   of the books, records, and documents that pertain to Empire's

25   collection of rents for the period of May going forward as well

87-10 51ST AVENUE OWNERS CORP.

1    as bank account statements and related documents.  Are you

2    aware of that?

3    A.    My understanding, and if I'm wrong, and maybe I

4    interpreted it wrong, but my understanding was that it was the

5    rents, and that's exactly what I brought, if we need --

6    Q.    You brought those documents?

7    A.    Yes.

8    Q.    And you turned them over?

9    A.    Yes.

10   Q.    Did you bring bank account statements?

11   A.    I brought what was paid to -- the sheet that was paid out,

12   in other words what was paid to Empire, and I also brought what

13   checks were taken in to match up to the rents.

14   Q.    Okay.  And do you agree that you will do everything

15   requested or required to cooperate with the debtor and Empire

16   to implement the terms of the settlement agreement once it's

17   approved by the bankruptcy court?

18   A.    Yes.

19   Q.    Thank you.

20          MR. MAGALIFF:  Your Honor, I have no other questions

21   of Mr. Peterson in connection with my order to show cause.

22          THE COURT:  All right.  Next question -- Mr. Spizz.

23          MR. SPIZZ:  Thank you, Judge.

24   CROSS-EXAMINATION

25   BY MR. SPIZZ:

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Mr. Peterson --

2    A.    Um-hum.

3    Q.    -- what are your duties and responsibilities at the -- at

4    Empire?

5    A.    My duties and responsibilities are to get the --

6    Q.    I'm going to ask you to speak into the microphone; we're

7    having a very difficult time hearing you.

8    A.    I know.  I'm not used to doing that.  Sorry.

9         My duties and responsibilities are to physically

10    collect -- well, I shouldn't say physically collect -- pick up

11    the rents from the box where they are deposited, record them,

12    and then issue the monthly statements.

13    Q.    This box, is this a box that's maintained at the premises

14    of the debtor?

15    A.    This is a box that is maintained at the Empire State

16    Building.

17    Q.    Oh, the Empire State -- you have a drop box at the Empire

18    State Building?

19    A.    We have a drop box in there, yes.

20    Q.    And that's where the Empire checks are mailed to?

21    A.    Correct.

22    Q.    Again, and just for the record, what is the address of

23    that box?

24    A.    It is 350 Fifth Avenue, 59th Floor, New York, New York,

25    10118.

87-10 51ST AVENUE OWNERS CORP.

1   Q.   Is there an actual office there or is this just a drop

2   box?

3   A.   It is a drop box.

4   Q.   Okay.  And so there may be some checked, as you said --

5   when you said there may be some checks in the box, that's the

6   drop box you were just talking about?

7   A.   Correct.

8   Q.   Okay.  By the way, do you get paid for your services on

9   behalf of Empire?

10  A.   No.

11  Q.   How long have you been working for Empire?

12  A.   I have been working for them for four years.

13  Q.   Okay.  And you've never gotten paid?

14  A.   I have submitted -- I have submitted invoices to the

15  company, yes, of which I have gotten paid for.

16  Q.   And when you say "invoices", what are those invoices for,

17  for services rendered or what?

18  A.   Correct, services.

19  Q.   What type of services?

20  A.   Basically doing the bookkeeping.

21  Q.   So you do -- you do give invoices to Empire?

22  A.   Um-hum.

23  Q.   Who do you give them to?

24  A.   Again, they are submitted through --

25  Q.   I'm sorry; I can't hear you, sir.

87-10 51ST AVENUE OWNERS CORP.

1   A.    They are submitted through James.

2   Q.    James who.

3   A.    Sheehan.

4   Q.    Okay.  And do those invoices differ in amounts each --

5   periodically --

6   A.    It's pretty much the hours that I work doing the billing.

7   Q.    Well, are these monthly invoices, weekly invoices, daily

8   invoices?

9   A.    It's an ongoing-as-needed type deal.

10  Q.    Well, generally, do you give the invoices every week?

11  A.    No, because I probably do it once or twice a month, and

12  that's it.

13  Q.    So as a general rule, you would give these invoices once

14  or twice a month to the company?

15  A.    Correct.

16  Q.    Okay.  And what are the amounts of these invoices?

17  A.    Probably like 200 dollars, 300 dollars.

18  Q.    And how do you compute the amount owed to you on a

19  particular invoice?

20  A.    It's on an hourly basis.

21  Q.    And how much do you get paid an hour?

22  A.    Thirty dollars.

23  Q.    Excuse me?

24  A.    Thirty dollars.

25  Q.    Thirty dollars an hour?

87-10 51ST AVENUE OWNERS CORP.

1    A.    Um-hum.

2    Q.    Okay, so you bill Empire thirty dollars an hour, you

3    submit an invoice, and you'll generally get paid?

4    A.    Um-hum.

5    Q.    And do you get paid by cash or check?

6    A.    Get paid by cash.

7            UNIDENTIFIED SPEAKER:  I'm sorry; I couldn't hear you.

8    A.    By cash.

9    Q.    And who gives you the cash?

10   A.    The cash is actually given by Robert, as well.

11   Q.    By Robert Val -- Mr. Valdes-Clausell?

12           THE COURT:  I'm going to direct you to move the

13   microphone --

14           THE WITNESS:  Okay.

15           THE COURT:  -- closer --

16           THE WITNESS:  Okay.

17           THE COURT:  -- so we make a good record.  Thank you

18   very much.

19   Q.    Can I ask you, sir, what is Mr. Clausell's relationship

20   with Empire?

21   A.    He is not a -- he's not a part of the company.

22   Q.    I can't hear you.

23   A.    He's not a part of the company.  I'm sorry; I'm dry.

24   Q.    He has no relationship that you're aware of?

25   A.    Correct.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    So can you please explain to me how Mr. Clausell comes

2    about paying you in cash your invoices for services to Empire?

3    A.    There is a -- well --

4    Q.    The microphone, please, sir.

5    A.    I know.  There is a -- it's more on a -- it's more on a

6    consultation basis.

7    Q.    Sir, I'm not sure I understand your answer.  He's a

8    consultant?

9    A.    He has been advising; let's put it --

10   Q.    And by the way, what type of consultant is he?

11   A.    An -- an -- I'm trying to put it into -- trying to think

12   how to phrase it.  Not hiding anything; I'm trying to figure

13   out --

14   Q.    the microphone, please.

15   A.    I know, I know, I know, I know.

16            MR. TABACHNIK:  Your Honor, I'm sorry to interrupt.

17   Douglas Tabachnik.  It's almost impossible to hear the witness

18   over the phone.

19            THE WITNESS:  I'm sorry.

20            MR. TABACHNIK:  I don't know if it's the same --

21            THE COURT:  The indication is that it is impossible to

22   hear over the phone.

23            THE WITNESS:  Oh, okay.

24            THE COURT:  I have asked and now directed

25            THE WITNESS:  Okay.

87-10 51ST AVENUE OWNERS CORP.

1          THE COURT:  -- you respectfully --

2          THE WITNESS:  Sorry.  Okay, all right.

3          THE COURT:  -- as is due a witness to speak directly

4    into the microphone.  You may move it.  It has a long

5    gooseneck; you may adjust it.  But we need to make a record and

6    everyone present in person and by telephone needs to be able to

7    hear you.

8          MR. TABACHNIK:  Thank you, Your Honor.

9    A.    There has been some advisement over the years from Mr.

10   Clausell with relationship to Empire.

11   Q.    Could you be more specific please, sir?

12   A.    On -- specifically on --

13   Q.    Look at -- sir, there's nobody out there to help you.

14   A.    No, I know.  I know there's not.  Specifically on just

15   things that, in general, business questions.

16   Q.    Could you give us an example, sir?

17   A.    On some financial natures.

18   Q.    Sir, I would ask if -- could you give us a particular

19   example of advice -- the type of advice that Mr. Clausell would

20   provide?

21   A.    Well, it's more in relation to, you know, new tenants

22   coming in and things like that, with direction in that

23   direction.

24   Q.    What type of advice with new tenants coming in?

25   A.    You know, whether -- it's a tenant and here is the -- here

87-10 51ST AVENUE OWNERS CORP.

1   is the -- here is the -- this is the new tenant.  I would then

2   prepare the documents for doing that, get the leases done, and

3   then they get signed by James.

4   Q.   Okay, he would assist with --

5   A.   Yes.

6   Q.   -- with new tenant leases?

7   A.   Correct.

8   Q.   Okay.  Anything else?

9   A.   Not that I know of, no.

10  Q.   That's it.  So he would assist with new tenant leases, and

11  once those new tenant leases --

12  A.   Um-hum.

13  Q.   -- were executed and in proper form and order, he would

14  not have -- please look at me, sir.

15  A.   Okay.

16  Q.   He would not have any other responsibilities or consulting

17  duties, as far as you know?

18  A.   No.

19  Q.   That's it?

20  A.   Um-hum.

21  Q.   Okay.  And do you know how it came about that Mr. Clausell

22  would be the person who paid your invoices that were submitted

23  to Empire?

24  A.   Well, I -- I believe that he was working with James

25  Sheehan when, as far as the -- he was working with James

87-10 51ST AVENUE OWNERS CORP.

1  Sheehan as far as -- as the banking and the deposits and things

2  like that.

3  Q.   Um-hum.  Okay.  And do you know where -- what the source

4  of those cash payments to you were?

5  A.   I'm going to assume they came from Empire.

6  Q.   You assume they came from Empire?

7  A.   Um-hum.

8  Q.   But as you sit here, is it your testimony today that

9  you're being paid by Mr. Clausell for services allegedly

10  rendered to Empire in cash and you really don't know where the

11  money came from?

12  A.   I'm going to assume that they came from Empire.

13  Q.   And can I ask do any of Empire's tenants pay their rent by

14  cash?

15  A.   No.

16  Q.   So --

17  A.   I can say that one hundred percent --

18  Q.   As far as you know, all --

19  A.   -- every single one.

20  Q.   You're pretty certain about that.

21  A.   I'm absolutely certain because I get all the deposits and

22  they're all in cash or -- I mean, they're all in money order or

23  checks.

24  Q.   Oh, money orders.

25  A.   Money orders or check.

87-10 51ST AVENUE OWNERS CORP.

1  Q.    Okay.  And to your knowledge, are all -- now you're

2  responsible for collecting the rents; right?

3  A.    I'm responsible for picking the ones up that go to the

4  box.

5  Q.    Okay.

6  A.    If there was something that a tenant did not pay and we

7  had to do that, then that's what -- that's where Eric would

8  take over and he would do the day-to-day stuff with the

9  tenants.

10  Q.    But you would -- in the lockbox, you would get checks and

11  money orders and things of that nature?

12  A.    Right.  Correct.

13  Q.    And were you also responsible for depositing those monies

14  into Empire's accounts?

15  A.    I wrote the deposit slips up, of which Mr. Sheehan made

16  the deposits at the bank since I don't have the bank signature.

17  Q.    And the question was asked before, I don't -- how many

18  bank accounts does Empire have?

19  A.    As far as I know, there is a money market account, there

20  is a regular bank account and then there are two security

21  deposit accounts.

22  Q.    And where are the two security deposit accounts located?

23  A.    I do not know.

24  Q.    You don't know?

25  A.    I don't know.

87-10 51ST AVENUE OWNERS CORP.

1    Q.   Do you know whether or not there's any balance in those

2    two security deposit accounts?

3    A.   I do not know.

4    Q.   Have no idea.

5    A.   Uh-hum.

6    Q.   And when you make a deposit, where do you make the deposit

7    of the rents that you collect from the rent box?

8    A.   As I said before, I don't make the deposits.  I leave them

9    for Mr. Sheehan to do it since he has the power with the bank

10   to do so.

11   Q.   Do you know whether any of these money orders or anything

12   else are cashed and not deposited?

13   A.   Not that I know of; no.

14   Q.   And you don't know what the source of cash is --

15   withdrawn.

16   A.   All right.

17   Q.   You believe it's from Empire.

18   A.   I believe it's from Empire.

19   Q.   Can I ask you why you're paid in cash rather than a check?

20   A.   I think it's a tax reason.

21   Q.   I'm sorry, what tax reasons?

22   A.   A tax --

23   Q.   Could you speak into the microphone?

24   A.   Personal tax reason.

25   Q.   What personal tax reason?

87-10 51ST AVENUE OWNERS CORP.

1   A.   In other words, there's no taxes taken out.

2   Q.   Oh, I see.  Okay.  So, there's no W-2; right?  No 1099?

3   A.   Correct.

4   Q.   Now there was a document that was identified as Exhibit 2

5   for identification.

6        MR. SPIZZ:  Your Honor, may I approach the witness?

7        THE COURT:  For purposes of --

8        MR. SPIZZ:  Thank you.

9        THE COURT:  Yes, you may.

10       MR. SPIZZ:  Thank you.

11   A.   There's a copy here.

12   Q.   Oh, you have a copy of it?

13   A.   Uh-huh.

14   Q.   Fine, thank you.

15       Do you recognize Exhibit 2 for identification?

16   A.   It appears to be a check for 60,000 dollars.

17   Q.   Have you ever seen that check before?

18   A.   I have not.

19   Q.   Thank you.  Do you recognize the signature on that check?

20   A.   That is the signature of James --

21   Q.   James Sheehan?

22   A.   -- Sheehan, uh-hum.

23   Q.   Okay.  And by the way, whose is the president of this

24   company?

25   A.   James is the president of the company.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Now that letter, I think it's Exhibit 3 in evidence, it

2    says by Paul Peterson, President.  Do you see that?

3    A.    We had -- we originally had briefly changed roles but it's

4    now reverted back to where it should be.

5    Q.    Well, wait.

6    A.    Because James has the majority shareholder.

7    Q.    All right.  Let's -- Mr. Sheehan -- let's put it this way,

8    up to May of 2012, has Mr. Sheehan been the president?

9    A.    Yes, he has.

10    Q.    Was he the president on May 15, 2012?

11    A.    Yes.

12    Q.    When did you and Mr. Peterson (sic) change jobs?

13    A.    It was shortly thereafter when we were attempting to seek

14    additional alternate counsel.  It would be -- it worked out

15    better that I would take the more active role in doing things.

16    Q.    And being the president?

17    A.    Yes.

18    Q.    And could you tell me approximately when you became

19    president?

20    A.    I don't have an exact date but I would assume it's around

21    20th, 21st, around there or so.

22    Q.    May 21?

23    A.    May 21.

24    Q.    And --

25    A.    The end of May.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Did there come a time -- and by the way, so you were

2    president on May 31?

3    A.    Yes.

4    Q.    And did there come a time when you stopped being

5    president?

6    A.    Yes.

7    Q.    And when was that?

8    A.    It was shortly thereafter.

9    Q.    Well, we're at June 8 now and this was May 31, a week ago.

10   When did you stop being president?

11   A.    It was within the last few days after --

12   Q.    How did that happen?  Was there a meeting of the board?

13   A.    We talked about it and --

14   Q.    Who is we?

15   A.    The three of us.  And we -- after we decided not to seek

16   the alternate counsel, it worked out better that we just went

17   back to the old arrangement.

18   Q.    So, you were president for a week.

19   A.    Uh-hum.

20   Q.    And now you're no longer president.

21   A.    Correct.

22   Q.    Now, you said that there's 104,000 dollars approximately

23   in collections for the month of May; correct?

24   A.    Correct.

25   Q.    Okay.  50,000 dollars was paid to a retainer to the

1    Anderson Kill firm; is that correct?

2    A.    Correct.

3    Q.    And we've been advised by counsel that those funds have

4    been return to his escrow.

5    A.    Correct.

6    Q.    Correct?  That's 50,000 dollars.  That leaves 54,000

7    dollars.  Could you tell me approximately where that 54,000

8    dollars went?

9    A.    My understanding is that there were two payments of 15,000

10   dollars to the corporation.

11   Q.    Two payments of fifteen?

12   A.    Fifteen.

13   Q.    So do you know where those payments were made?

14   A.    I don't have it with me.

15   Q.    Well, you don't remember where they were made?

16   A.    I don't remember where they were made.

17   Q.    By the way, was there a payment made by the corporation

18   directly to an account controlled by the debtor's old board,

19   Mr. Dovis and Ms. -- I forget her --

20   A.    I believe there was a wire transfer.

21   Q.    There was a wire transfer to that account.

22   A.    For 15,000 dollars; correct.

23   Q.    15,000 dollars?

24   A.    Correct.

25   Q.    And that was an account not under the control of the

87-10 51ST AVENUE OWNERS CORP.

1    property manager, that was an account that was still under the

2    control of the debtor and their old board; correct?

3    A.    Correct.

4    Q.    Now you knew the property manager was the one responsible

5    for collecting the rents; correct?

6    A.    Correct.

7    Q.    Why was it then knowing full well that the property

8    manager was the one who was supposed to get the rents -- and

9    that's been going on now since the plan of reorganization --

10   why would you take money and send it to an account under the

11   control of the old board members?

12   A.    I didn't send the money to the account.

13   Q.    Who did?

14   A.    That would be James because James has the full

15   financial --

16   Q.    But you knew it was -- by the way, were you part of the

17   decision to send it to that account?

18   A.    I heard of it after the fact.

19   Q.    After the fact.

20   A.    Yes.

21   Q.    Do you know why it was done?

22   A.    My understanding it was done to do that, so that the U.S.

23   Trustee could get paid.

24   Q.    And you didn't want the outside property manager to pay

25   the U.S. Trustee?

87-10 51ST AVENUE OWNERS CORP.

1    A.    I don't know anything further than that.

2    Q.    Uh-hum.

3    A.    But that's my understanding of what it was -- why it was

4    done.  That's it.  That's all that --

5    Q.    So, that's part of the 15,000 dollars that was paid.  You

6    said there was another 15,000 dollars?

7    A.    Correct.

8    Q.    That would be -- and do you know where that 15,000 dollars

9    went?

10   A.    That went as well to the -- that should have gone to the

11   lockbox as well.

12   Q.    The lockbox --

13   A.    The lockbox for the --

14   Q.    -- under the control of the property manager?

15   A.    Correct.

16   Q.    Or the bank account under the control of the old board

17   members?

18   A.    To the lockbox for the property.

19   Q.    Okay.  So, that's 30,000 dollars --

20   A.    Uh-huh.

21   Q.    -- the two fifteen.  So, that leaves about 24,000 dollars

22   unaccounted for, if I our math is right.

23   A.    Okay.

24   Q.    Do you know where that -- and you said that you have 7,000

25   dollars in the bank?

87-10 51ST AVENUE OWNERS CORP.

1    A.    Correct.

2    Q.    So which means you agree to turn over --

3    A.    Of course.

4    Q.    -- to the property manager --

5    A.    Of course.

6    Q.    Correct?  So that leaves 17,000 dollars unaccounted for.

7    A.    Okay.

8    Q.    Where is that 17,000 dollars?

9    A.    I would have to get the bank statement and look at it but

10   we would cooperate with doing that.

11   Q.    In your opinion, would Mr. Sheehan know where that 17,000

12   dollars is?

13   A.    I can't say whether he will or he won't.

14   Q.    Well, if anybody spent it, it would be Mr. Peterson;

15   right?

16   A.    If anybody spent it -- if any checks or anything

17   distributed from that, that would come out of Mr. Sheehan

18   because --

19   Q.    Right.  Is --

20   A.    -- he's the one that's got the sole signature power.

21   Q.    Right.  Is there anyone other than Mr. Sheehan who was

22   responsible for having monies transferred out of the Empire

23   bank accounts in any form?

24   A.    Not that I know of.  He's --

25   Q.    Whether it's wire transfer, whether it's check, whether

87-10 51ST AVENUE OWNERS CORP.

1    it's whatever, it's only Mr. Sheehan.

2    A.    He has the sole signature power; correct.

3    Q.    Nobody else.

4    A.    Correct.

5          MR. SPIZZ:  No further questions of this witness right

6    now.

7          THE COURT:  As a point of information, I would like to

8    ask Empire's counsel whether Mr. Valdes-Clausell is an officer

9    or employee of Empire?

10         MR. ALOE:  It is my understanding that he is not.

11         THE COURT:  All right.  Thank you.

12   CROSS-EXAMINATION

13   BY MR. WEINSTEIN:

14   Q.    Mr. Peterson, where does Mr. Sheehan live?

15   A.    As far as I know, he lives in Maspeth.

16   Q.    He's lived in Maspeth a long time, hasn't he?

17   A.    Yes, it's his parents' house.

18   Q.    It's his parents' house?

19   A.    Correct.

20   Q.    Mr. Garcia knows that.  Don't you know that?  He knows

21   that, doesn't he?

22         UNIDENTIFIED SPEAKER:  Objection.

23         THE COURT:  Sustained.  You should ask a person about

24   his personal knowledge, not about the knowledge of another

25   person especially when that witness was also testifying.  I'm

87-10 51ST AVENUE OWNERS CORP.

1   going to sustain that objection.  You can reformulate the

2   question.  If it avoids the problem, then perhaps you can

3   proceed.

4   Q.   You saw Mr. Garcia testify that Mr. Sheehan lived in

5   Howard Beach; didn't you?

6   A.   Correct.

7   Q.   And after that proceeding or during that proceeding, you

8   said to Mr. Garcia, didn't you, "Oh, no, no, no, Mr. Sheehan

9   lives with his parents.  You know that."  Didn't you tell him

10  that?

11  A.   I didn't specifically say that, no.

12  Q.   Did you say it generally to him?

13  A.   No, I did not.

14  Q.   You didn't say it at all, did you?

15  A.   No.

16  Q.   Did you know it was wrong at the time?

17  A.   At the time -- I'll rephrase that, at the time that he did

18  it, he did live in Howard Beach.  Now my understanding is he

19  lives in Maspeth.

20  Q.   So a few weeks ago he lived in Howard Beach.

21  A.   Correct, up until the end of May.

22  Q.   Up until the end of May?

23  A.   Uh-hum.

24  Q.   And then he moved?

25  A.   As far as I know, yes.

87-10 51ST AVENUE OWNERS CORP.

1   Q.   Did he tell you that?

2   A.   He didn't specifically tell me that.

3   Q.   How many times have you spoken to Mr. Sheehan in your

4   life?

5   A.   How many times have I spoken to Mr. Sheehan in my life?

6   Probably at least ever -- at least once every week since we

7   started this company.

8   Q.   Okay.

9         THE COURT:  And I'm going to ask you again to pull

10   that microphone up closer.

11        THE WITNESS:  Okay.  At least every -- at least once a

12   week, ever since this company's been formed.

13   Q.   Okay.  And you would call him on the telephone?

14   A.   I would call him on the telephone or -- yes.

15   Q.   Or what?

16   A.   Or I would see him and I usually -- at the building.

17   Q.   You would see him at the building?

18   A.   Yes.

19   Q.   How many times have you seen him at the building?

20   A.   I don't have a specific number, I mean, but it has been on

21   occasion that we have done that with respect to the apartments

22   that we --

23   Q.   Approximately how many times have you met Mr. Sheehan at

24   the building?

25   A.   I want to say ten.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Where in the building have you met him?

2    A.    It's either been in the -- one of the apartments that we

3    have that are vacant or it has -- and then there's been a few

4    times where it's been in the board members' office, the

5    boardroom.

6    Q.    In the board members' office?

7    A.    The board room, yes, for the building.

8    Q.    Have you ever met in Mr. Clausell's apartment?

9    A.    I have been in Mr. Clausell's apartment.

10   Q.    With Mr. Sheehan?

11   A.    Not with Mr. Sheehan, no.

12   Q.    Does Mr. Clausell have records of Empire in his apartment?

13   A.    Not that I know of.

14   Q.    Has he ever?

15   A.    Not that I know of.

16   Q.    What records of Empire do you have, do you personally

17   possess?

18   A.    I have absolutely no records on my person whatsoever.

19   Q.    Do you possess these records elsewhere, not on your

20   person?

21   A.    There are records in the building that we use in the

22   vacant apartment that we're using right now currently as the

23   office, yes.

24   Q.    So, the records for Empire are in a vacant apartment at

25   the building?

87-10 51ST AVENUE OWNERS CORP.

1  A.  Correct.

2  Q.  What apartment?

3  A.  They are between 2F and 2S, both vacant apartments.

4  Q.  Are there records in 2F?

5  A.  Yes.

6  Q.  Are there records in 2S?

7  A.  Yes.

8  Q.  What records are in each?

9  A.  There are the outgoing statements that we do and there are

10  a copy of all of the original leases that -- since we sent the

11  originals to Mr. Lamb's office, we have copies of them all.

12  Q.  Where are the banking records?

13  A.  The banking records are with the accountant with Shashi

14  Malik in Baldwin, New York.

15  Q.  All the financial records are with Shashi Malik?

16  A.  Yes.

17  Q.  Including the check register?

18  A.  I would not say that.

19  Q.  Where is that?

20  A.  My understanding is that that's with Mr. Sheehan since he

21  has the signature power.

22  Q.  Does he have a checkbook?

23  A.  Yes, there's a checkbook.

24  Q.  You've seen it?

25  A.  Yes.

1    Q.    Where have you seen it?

2    A.    I've seen it in the building.

3    Q.    Where in the building?

4    A.    In the two vacant apartments.

5    Q.    The checkbook?

6    A.    Yes.

7    Q.    When's the last time you saw the checkbook?

8    A.    I have not seen that probably for a month.

9    Q.    Is the checkbook with Mr. Sheehan in his home or is it at

10   the building?  Where is it?

11   A.    The checkbook is in the building in the apartments that

12   we're using as the offices, from my understanding.

13   Q.    Now, this is, I believe, Debtor's Exhibit 2, the 60,000-

14   dollar check.

15   A.    Uh-huh.  Yup.  Yes.

16          THE COURT:  For the sake of an accurate record, this

17   has been marked for identification but not offered.

18          MR. WEINSTEIN:  Your Honor, I offer it.

19          THE COURT:  Any objection?  Without objection, the one

20   page document which is a copy of a check and some additional

21   information dated May 10, 2012 made by Empire State

22   Conglomerates will be received in evidence.

23          (Check for 60,000 dollars was hereby received into

24   evidence as Debtor's Exhibit 2, as of this date.)

25   Q.    Now you recognize -- do you have it in front of you, by

87-10 51ST AVENUE OWNERS CORP.

1    the way?

2    A.    Yes.

3    Q.    Debtor's Exhibit 2?

4    A.    Uh-hum.

5    Q.    You recognize that squiggly line as Mr. Sheehan's

6    signature?

7    A.    Yes, that is -- that is his signature.

8    Q.    As far as you know, does he sign all the checks that way?

9    A.    Yes.

10    Q.    He doesn't sign his name?

11    A.    He doesn't sign his name.  The only time he signs his name

12    is on a lease.

13    Q.    Have you discussed that with him, the different signatures

14    that he uses and why he does that?

15    A.    I did not.

16    Q.    Now you see that this is a 60,000-dollar check dated May

17    10, 2012; correct?

18    A.    Uh-hum.

19    Q.    When is the first time you saw this check?

20    A.    The first time I saw this check was, I would say probably

21    a couple of weeks ago.

22    Q.    A couple weeks ago?

23    A.    Yeah.

24    Q.    Where were you when you saw it?

25    A.    It's my understanding that this went out and this was --

87-10 51ST AVENUE OWNERS CORP.

1   it was done and then it was -- it went to the lockbox.

2   Q.   I'm going to ask you again, where were you when you first

3   saw this check?

4   A.   It was in the apartment.

5   Q.   What apartment?

6   A.   The one where we're using as the office.

7   Q.   Were you by yourself or with someone else?

8   A.   I was with James.

9   Q.   Was anyone else there?

10  A.   No.

11  Q.   Just you and James?

12  A.   Yes.

13  Q.   What day was this?

14  A.   I don't have the exact date.

15  Q.   What did you discuss?

16  A.   Payment to the -- the payment to the building for the --

17  for maintenance and interest.

18  Q.   What did he say to you?  What did James Sheehan say to you

19  and what did you say to him at that time?

20  A.   I don't recall the exact language.

21  Q.   What do you recall?

22  A.   That this was the check and I only saw the copy -- this

23  was the check that went out to the lockbox for --

24  Q.   But then -- but this is the check that went out to the

25  lockbox.

87-10 51ST AVENUE OWNERS CORP.

1   A.   No, I asked if that's what it was and that that's what I

2   was told.  It went to the lockbox.

3   Q.   Who told you that?

4   A.   He did.

5   Q.   James Sheehan?

6   A.   Yes.

7   Q.   He told you it went to the lockbox?

8   A.   Yes.

9   Q.   What's the lockbox?

10  A.   The lockbox is where we send the -- all of the things for

11  the 87-10.

12  Q.   Who did he say sent it to the lockbox?

13  A.   I assumed it was him.

14  Q.   Did he tell you that?

15  A.   Not in so many words, but he -- if that's where he said it

16  went, that's where he said it went.

17  Q.   All right.  Was there enough money in the account to fund

18  this check when you were -- at the time that you were with Mr.

19  Sheehan in the apartment discussing this check?

20  A.   I can't say for sure.

21  Q.   What was the context --

22  A.   I can't say for sure.

23  Q.   Why were you discussing this check?  What was the context?

24  How did it come up?

25  A.   It came up in the context that what payments we had sent

1   out to 87-10 for the month.

2   Q.   How did that come up?

3   A.   Because it was on the -- one of the legal orders that we

4   had to do and I said how much have we sent to them for that to

5   get that prepared.

6   Q.   What legal order are you talking about?

7   A.   I don't have the specific one but it was in preparing of

8   documents of what we have paid because there was an allegation

9   that we had not paid maintenance for the month and I was -- we

10  were collecting up the payments.

11  Q.   All right.

12  A.   I was trying to pull together the records to show what we

13  had done.

14  Q.   So you were asked r at least you were discussing with Mr.

15  Sheehan a court order requires that we turn the money over to

16  the outside property manager; correct?

17  A.   Correct.

18  Q.   So you knew at that time that all the May rents had to be

19  turned over to the outside property manager at the time you had

20  the conversation with Mr. Sheehan in the office; correct?

21  A.   Rephrase the question.

22  Q.   All right.

23  A.   Or repeat the question, please.

24  Q.   At the time you were discussing this check, Debtor's

25  Exhibit 2 with Mr. Sheehan in the apartment --

87-10 51ST AVENUE OWNERS CORP.

1    A.    Uh-hum.

2    Q.    -- you knew that there was a court order requiring you to

3    turn over the May payments to the outside property manager.

4    A.    Okay.  My understanding is and again correct me if I am

5    wrong, my understanding is that the court order has required

6    everything after the 14th; isn't that correct?

7    Q.    Was this after the 14th, the conversation that you had

8    with Mr. Sheehan?

9    A.    Yes.

10    Q.    So it was after the 14th; correct?

11    A.    Uh-huh.

12    Q.    So after the 14th, it was at least your understanding

13    based on your conversation with Mr. Sheehan that Empire had

14    60,000 dollars that needed to be turned over to the outside

15    property manager; correct?

16    A.    And my understanding was that the check covered that and

17    it went through.

18    Q.    So, after the 14th --

19    A.    Uh-hum.

20    Q.    -- your understanding after the 14th --

21    A.    Uh-hum.

22    Q.    -- Empire had at least 60,000 dollars that it was required

23    by court order to pay the outside property manager; correct?

24    A.    That is my -- that is my assumption; yes.

25    Q.    And Mr. Sheehan told you that that payment had been made;

87-10 51ST AVENUE OWNERS CORP.

1   correct?

2   A.   Yes.

3   Q.   There came a time when you find out that payment hadn't

4   been made; isn't that right?

5   A.   I understand that it hadn't been cashed.

6   Q.   That it had been cashed?

7   A.   Had not been cashed --

8   Q.   That it had not been --

9   A.   -- because there was no record of it --

10  Q.   -- cashed --

11  A.   -- there was no record of it on the thing, so what

12  happened to it along the way, I do not know.

13  Q.   Okay.  So, you -- someone told you that it had not been

14  cashed.

15  A.   It had not cleared the account.

16  Q.   You checked that?

17  A.   I did check that.

18  Q.   How did you check it?

19  A.   Through the accountant.

20  Q.   Shashi Malik?

21  A.   Yes.

22  Q.   You called him?

23  A.   Well, I -- yes.  No, I did not.  I can't say that I did

24  that, no.

25  Q.   You didn't call him?

87-10 51ST AVENUE OWNERS CORP.

1    A.    No.

2    Q.    Or you did call him?

3    A.    No, I did not.

4    Q.    You didn't call him?

5    A.    No and I found -- what I found out subsequently was that

6    looking at the statements that I pulled for this hearing, that

7    that was not -- it has not been cashed.

8    Q.    Okay.  So you pulled statements for this hearing.

9    A.    Correct.

10   Q.    Where are the statements?

11   A.    I believe I handed them over to you.

12   Q.    The one bank statement that you handed over?

13   A.    Uh-hum.

14   Q.    All right.

15   A.    It shows everything that was paid out to Empire, not the

16   money market account.  It shows everything that was paid out

17   to --

18          MR. WEINSTEIN:  Okay.  I'm going to ask that this be

19   marked as Debtor's Exhibit 5.  This was produced today by

20   Empire.  So, we only have one copy.

21          THE COURT:  We can make copies.

22      (Bank statement was hereby marked for identification as

23   Debtor's Exhibit 5, as of this date.)

24   Q.    I'm going to hand you what has been marked as Debtor's

25   Exhibit 5 and ask you to take a look at this.

1   A.   Uh-hum.  Okay.

2   Q.   When did you print that out?

3   A.   This was printed out yesterday.

4        THE COURT:  Mr. Peterson, I'm going to remind you

5   again of the importance of making a good record.

6        THE WITNESS:  This was printed out yesterday.

7   Q.   All right.  So you found out yesterday that the 60,000-

8   dollar check had not been cashed; correct?

9   A.   Correct.

10  Q.   But you gave 50,000 dollars to a lawyer before that time,

11  didn't you?

12  A.   Yes, that was done.

13  Q.   All right.  So, at the time you gave the 50,000 dollars to

14  the new lawyer, you knew that no 60,000 dollars had been paid

15  to the debtor; isn't that right?

16  A.   Again, I didn't take care of the transaction.  I don't

17  handle the bank account.

18  Q.   Excuse me?

19  A.   I didn't take care of the initial transaction.  I don't

20  run -- I don't have the access to the bank account that way.

21  Q.   But you made the decision to hire the new lawyer though;

22  didn't you?

23  A.   We collectively made the decision to do it, between the

24  three of us.

25  Q.   You didn't discuss that at all with Robert Clausell ever;

87-10 51ST AVENUE OWNERS CORP.

1    did you?

2    A.    No.

3    Q.    Never mentioned it to him; right?

4    A.    No.  I'll rephrase the thing -- I'll rephrase how I said

5    that.  Upon Robert had suggested through his lawyer that this

6    might be a lawyer that might be able to help us.

7    Q.    Robert told you that?

8    A.    Robert's lawyer suggested that this lawyer might be good

9    as alternate counsel.

10   Q.    Is Robert's lawyer acting as Empire's counsel?

11   A.    No, he is not.

12   Q.    But he provided advice to you on whether to hire a new

13   lawyer?

14   A.    He made the suggestion, I think, to Robert and Robert

15   suggested it to us.

16   Q.    Oh, so you never spoke to Robert's lawyer directly; did

17   you?

18   A.    Correct.

19   Q.    Oh, you spoke to Robert?

20   A.    Correct.

21   Q.    Okay.  Where was this?

22   A.    This was over a phone conversation.

23   Q.    When?

24   A.    It had to be towards the end of May, about a week ago.

25   Q.    About a week ago?

87-10 51ST AVENUE OWNERS CORP.

1    A.    Over the Labor Day weekend.

2    Q.    Over the --

3    A.    Over Memorial Day weekend.

4    Q.    Over Memorial Day weekend.

5    A.    Correct.

6    Q.    Do you remember which day on Memorial Day weekend?

7    A.    I spoke to the new counsel and seeing that it was

8    appropriate, it was on a Sunday, the Sunday of Memorial Day

9    weekend.

10   Q.    Just one moment.  So, Robert gave you the name of the new

11   lawyer; correct?

12   A.    I got -- which I -- yes, from what I understand which was

13   recommended by his lawyer.

14   Q.    Well, I am asking you, did Robert give you the name of the

15   new lawyer?

16   A.    Yes.

17   Q.    Over the telephone?

18   A.    Yes.

19   Q.    Did he give you the name of more than one lawyer or just

20   one lawyer?

21   A.    He just gave us this particular one.

22   Q.    Okay.  Did he tell you that that lawyer had already been

23   paid?

24   A.    He did not tell me that it had been paid; no.

25   Q.    You arranged to pay him, the new lawyer?

87-10 51ST AVENUE OWNERS CORP.

1   A.   I didn't make any arrangement whatsoever.  I don't have --

2   again, control of the bank account, so I don't do that.

3   Q.   All right.  Had the lawyer already been retained by

4   Memorial Day weekend?

5   A.   Not that I know of.

6   Q.   And Robert told you we're hiring this lawyer; isn't that

7   right?

8   A.   He didn't come out and tell me we're hiring the new

9   lawyer.  We decided as a group that that would be the

10  appropriate way to do it.

11  Q.   Okay.  So, the other two gentlemen --

12  A.   Right.

13  Q.   Mr. Garcia --

14  A.   Correct.

15  Q.   -- and Mr. Sheehan were on the phone with you and Mr.

16  Clausell when you were discussing whether to hire the new

17  lawyer.

18  A.   Mr. Clausell was not part of that conversation.

19  Q.   Who got the name of the lawyer first, the new lawyer?

20  A.   I'm sorry?

21  Q.   Who received on behalf of Empire the name of the new

22  lawyer first?

23  A.   I did.

24  Q.   You did?

25  A.   Yes.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    What did you do then?

2    A.    I called the other two members and said that this might be

3    appropriate way to go.

4    Q.    Did you tell them that Robert thought this was a good

5    idea?

6    A.    I said that he had suggested and that we talk to them.

7    Q.    Okay.  And this new idea was to hire a new lawyer;

8    correct?

9    A.    Correct.

10    Q.    And fire Mr. Aloe; correct?

11    A.    Correct.

12    Q.    Because that would get you a delay in this proceeding;

13    isn't that right?

14    A.    Not correct.  It -- we were -- quite frankly, we were

15    considering actually because -- filing for Chapter 11 our self

16    and that's what this firm specializes in -- one of the things

17    they do.

18    Q.    When you discussed with Mr. Sheehan and Mr. Garcia whether

19    to hire the new lawyer --

20    A.    Uh-hum.

21    Q.    -- did you discuss whether there was sufficient funds to

22    hire that new lawyer?

23    A.    I can't say it came up at the exact moment, no.

24    Q.    Well, you wouldn't have been discussing whether to hire a

25    new lawyer if there was no money to hire a new lawyer; correct?

87-10 51ST AVENUE OWNERS CORP.

 1   A.   Correct.

 2   Q.   So you knew you had enough money to hire the lawyer.

 3   A.   That was the assumption; yes.

 4   Q.   All right.  So you knew that the 60,000 dollar check as of

 5   Memorial Day weekend had not been negotiated; isn't that right?

 6   And that's Debtor's Exhibit 2.

 7   A.   Yes.

 8   Q.   In fact, you knew that it had never been given to the

 9   debtor; isn't that right?

10   A.   No, that I don't know at all.

11   Q.   Did you send it?

12   A.   I did not send it.

13   Q.   Did Mr. Sheehan tell you he sent it?

14   A.   I did -- my understanding was that it was sent.

15   Q.   Did Mr. Sheehan tell you he sent it?

16   A.   Specifically, no.

17   Q.   Generally?

18   A.   Yes.

19   Q.   What did he say?  What words did he use?

20   A.   I don't recall.

21   Q.   It never happened; did it?  There was no such conversation

22   where he generally told you he sent this; isn't that right?

23   A.   I can't say that, I don't.

24   Q.   You don't recall him ever telling you he sent it; isn't

25   that right?

87-10 51ST AVENUE OWNERS CORP.

1   A.   Okay.  I don't recall.

2   Q.   I'm not asking you whether you -- well, let me ask you

3   again.  He never told you that he sent it; correct?

4   A.   Yes.

5   Q.   That's correct, isn't it?

6   A.   Uh-hum.

7   Q.   He never told you.

8   A.   Right.

9   Q.   Now you say that there were two payments to the debtor in

10  the amount of 15,000 dollars each in the month of May.

11  A.   Yes.

12  Q.   One of them, counsel for the committee reviewed with you,

13  it was the wire transfer to a rarely used account of the debtor

14  which was then used to pay the --

15  A.   Correct.

16  Q.   -- U.S. Trustee; correct?

17  A.   Uh-hum.

18  Q.   There was no second 15,000-dollar payment; isn't that

19  right?

20  A.   I believe there was.

21  Q.   When was it?

22  A.   I would have to get a copy of it but I believe there was.

23  Q.   It was in April, wasn't it?  It was for April, wasn't it?

24  A.   It may have been in April and it may have cleared in May.

25  Q.   Wasn't that for April, not May?

87-10 51ST AVENUE OWNERS CORP.

1    A.    It may have been.

2    Q.    But you testified here it's for May.

3    A.    It may have -- but I believe it cleared in May, so all

4    right, I'm sorry that's the technicality, yes, it may have been

5    for April then.

6    Q.    Okay.  We are here discussing what happened to the May

7    rent.

8    A.    Okay.

9    Q.    Correct?

10   A.    Correct.

11   Q.    That second 15,000-dollar payment was made in April in

12   regard to April rent; isn't that right?

13   A.    Okay.  Yes.

14   Q.    So you received cash.  The only payments -- strike that.

15         The only payments that you've received for services for

16   Empire has been cash payments from Robert Clausell; isn't that

17   true?

18   A.    Correct.

19   Q.    Where were you when you received these payments?

20   A.    Where was I?

21   Q.    Yes, where were you physically when you received the cash?

22   A.    Well, it would be at the building or wherever I was doing

23   the statements on that particular evening.

24   Q.    It would be at the building sometimes?

25   A.    It would be at the building.

87-10 51ST AVENUE OWNERS CORP.

1   Q.   Where in the building?

2   A.   It would be in one of the two apartments that we're using

3   for offices.

4   Q.   Are you still using those for offices?

5   A.   They are still there; yes.

6   Q.   I'm asking you whether --

7   A.   Yes.

8   Q.   -- you are still using them for offices.

9   A.   Yes, yes.

10  Q.   Okay.  So you would receive cash payments in those

11  apartments; correct?

12  A.   I'm sorry?

13  Q.   You would receive --

14  A.   Yes, yes.

15  Q.   -- cash payments from Mr. Clausell --

16  A.   Yes, yes.

17  Q.   -- in the apartment?

18  A.   Yes, yes, yes.

19  Q.   Because he had keys to the apartments; correct?

20  A.   No, not that --

21  Q.   How did he get in?

22  A.   What do you mean how did he get in?

23  Q.   How did he get into the apartments --

24  A.   Well --

25  Q.   -- to give you the cash?

87-10 51ST AVENUE OWNERS CORP.

1    A.    Why would he get into the apartment if it's not his

2    apartment?  He wouldn't have that, no.

3    Q.    All right.  Maybe I misunderstood you.  I thought that you

4    testified that you received payments in cash from Robert

5    Clausell --

6    A.    Okay.

7    Q.    -- in the two apartments that Empire uses as offices at

8    the property, 87-10.

9    A.    Okay.

10   Q.    Is that correct?

11   A.    Yes.

12   Q.    All right.  Did he have a key to those apartments?

13   A.    Not that I know of.

14   Q.    Did you?

15   A.    I have keys, yes.

16   Q.    And you would let him in?

17   A.    Yes.

18   Q.    And you would meet there?

19   A.    Yes.

20   Q.    And he would give you cash?

21   A.    Occasionally, yes.

22   Q.    Did he give you any receipts?

23   A.    Receipts?  No.

24   Q.    Did he give you any tax forms of any kind?

25   A.    No.

87-10 51ST AVENUE OWNERS CORP.

1    Q.   Did you ever go to the bank with Robert Clausell for any

2    purpose?

3    A.   No.

4    Q.   Did you ever wait outside in the car when he went to the

5    bank?

6    A.   No.

7    Q.   How did he generate the cash to give it to you?

8    A.   I can't say.  I don't know.

9    Q.   No idea?

10   A.   No idea.

11   Q.   How would he give you the cash?  Would he just take it out

12   of his pocket or did he give it to you in an envelope or how?

13   A.   He had it on him.

14   Q.   In his wallet?

15   A.   Uh-hum.

16   Q.   So he'd just out his wallet and give you cash?

17   A.   Uh-hum.

18          THE COURT:  I would like to remind the witness to

19   answer with a word --

20          THE WITNESS:  Yes.

21          THE COURT:  -- rather than uh-hum or --

22          THE WITNESS:  Yes, yes.

23          THE COURT:  Thank you.

24   Q.   Did you have your invoices with you?

25   A.   I had an invoice; yes.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    With you?

2    A.    Yes.

3    Q.    At the time that you would get cash?

4    A.    Uh-hum.

5    Q.    And you --

6    A.    Yes.

7    Q.    And you gave it to Robert Clausell?

8    A.    Yes.

9    Q.    Do you have copies of all these invoices?

10   A.    I don't have them with me.

11   Q.    Do you possess somewhere copies of the invoices that you

12   gave to Robert Clausell?

13   A.    Yes.

14   Q.    How many approximately -- how many of them are there?

15   A.    I want to say maybe ten, fifteen.

16   Q.    Over a four-year period?

17   A.    Yeah.

18   Q.    Ten or fifteen?

19   A.    Yeah.

20   Q.    What do they say on them, just generally?

21   A.    So many hours, thirty dollars, twenty-five, whatever it

22   was at the time, whatever the total is.

23   Q.    And he would just take out his --

24   A.    Uh-hum.

25   Q.    -- wallet and pay you?

87-10 51ST AVENUE OWNERS CORP.

1    A.    Uh-hum.

2    Q.    But it would be hundreds of dollars.

3    A.    Okay.

4    Q.    Yes?

5    A.    Yes.

6    Q.    So he knew how much he was going to pay you.

7    A.    He may have had it on him, I don't -- I don't know that he

8    specifically knew how much he was going to pay me.

9    Q.    All right.  So, I mean in your experience, does Robert

10   Clausell carry around all the time hundreds of dollars with

11   him?

12   A.    He has cash with him, yes.

13   Q.    He generally carries around hundreds of dollars with him?

14   A.    Yes, he's always done that ever since I have known him.

15   He's not a credit card person, just -- I've known him for

16   twenty-seven years, so --

17   Q.    Where's the cash from that he gave you?

18   A.    I do not know.

19   Q.    Did you ask him?

20   A.    I didn't, no.

21   Q.    Did you not ask him because you didn't want to know?

22   A.    I would say yes.

23   Q.    So you avoided finding out where the cash was from by not

24   asking him.

25   A.    Uh-hum.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Who has all the corporate records for Empire?

2    A.    They were with the accountant.

3    Q.    Oh, he has all the corporate records?

4    A.    Yes.

5    Q.    Like the corporate book?

6    A.    Yes.

7    Q.    Today, still?

8    A.    Yes.

9    Q.    Now you know that these records have been requested many

10   times throughout this bankruptcy proceeding and by NCB; isn't

11   that right?

12   A.    I can't say that because this is my second appearance

13   here.

14   Q.    You know more about this proceeding than has occurred in

15   these two appearances.

16   A.    I have been filled in, yes.

17   Q.    And one of the things you were filled in about was that

18   the corporate records and the records generally of Empire have

19   been demanded a couple of times.

20   A.    No, I actually have not.

21   Q.    No one told you that?

22   A.    No one told me that?

23   Q.    But the records, the corporate records, are with --

24   currently are with the accountant; correct?

25   A.    Correct.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    All right.  But you have records of your own ownership;

2    isn't that right?

3    A.    I do not have a copy, no.

4    Q.    You don't have a copy that you are a shareholder of

5    Empire?  You don't have a copy of that either?

6    A.    No.  I've seen it and I signed it but I don't have a copy

7    of it.

8    Q.    Where -- okay, fine.  Isn't it true there never was an

9    office at the Empire State Building?

10   A.    There was at one point, yes.

11   Q.    Who rented that office?

12   A.    We rented the office.

13   Q.    Who is we?

14   A.    The Empire State Conglomerates.

15   Q.    Were you ever there?

16   A.    Yes.

17   Q.    How many times?

18   A.    Every month that the bills needed to go out.

19   Q.    Between what period of time was there an office at the

20   Empire State Building?

21   A.    There was from the beginning, from about 2008 till about

22   2010.

23   Q.    And then it just became a drop box?

24   A.    It just became a drop box.  It was a drop box with that

25   but the first thing it was, it's a virtual office.  So we had

87-10 51ST AVENUE OWNERS CORP.

1    the drop box originally and then there came space available and

2    then that particular facility closed and then there was not

3    anything -- it transferred over to another one in the same

4    building and it just became that we had just the box because

5    they didn't have space available.

6    Q.    Did you ever keep any records of Empire at the Empire

7    State Building?

8    A.    Yes, they were there originally when we had the office

9    there.

10   Q.    Okay.  And then they were taken to the accountant?

11   A.    Correct.

12          MR. WEINSTEIN:  I have nothing further at this time,

13   Your Honor.

14          THE COURT:  All right.  Mindful that we do not have a

15   great deal more time and we still have at least one more

16   witness, any -- you have an opportunity to question but

17   certainly not a requirement.  Mr. Luckman?  Mr. Miller?  Wave?

18          MR. MILLER:  Just one or two questions.

19          THE COURT:  All right.  I'm going to ask you to come to

20   to the podium please.

21          MR. MILLER:  Sorry?

22          THE COURT:  I'm going to ask you to come to the podium

23   please.  Thank you.

24   CROSS-EXAMINATION

25   BY MR. MILLER:

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Mr. Peterson, on June 1, did you go to various of your

2    tenants and collect rent for Empire?

3    A.    Did I physically collect the rent?

4    Q.    Yes.

5    A.    No, I did not physically collect the rent.

6    Q.    Did you visit your tenants on May 1 -- on June 1?

7    A.    I did not visit them, no.

8    Q.    Did you walk around the building on June 1?

9    A.    I walked around the building and I put notices under their

10   door.

11   Q.    And was somebody walking around the building with you?

12   A.    Yes.

13   Q.    Why were you walking around the building?

14   A.    I was -- why was I walking around the building?  Because I

15   was putting the notices under the door.  Am I missing the

16   question?

17   Q.    Yes.  And who was the person who went with you?

18   A.    Yes, I was with Robert.

19   Q.    Okay, thank you.

20   A.    And the reason that --

21   Q.    Thank you.  That's all.

22   A.    Okay.

23          THE COURT:  Did you finish your answer?  You were with

24   Robert and --

25          THE WITNESS:  But I didn't -- I have an answer and the

87-10 51ST AVENUE OWNERS CORP.

1    only reason that I did that was because I don't normally do

2    that.  Things like that are normally handled by Eric who does

3    the day-to-day stuff and I didn't know the orientation of the

4    building and since Robert was the former property manager, I

5    felt that was that -- that was the reason.

6              THE COURT:  Does any other counsel have a question?

7              MR. SPIZZ:  Judge, I have one question, because I know

8    we're short of time and I promise --

9              THE COURT:  Let's come back to -- before we go back to

10    what is, in effect, redirect -- recross, Mr. Aloe, do you have

11    any questions?

12              MR. ALOE:  Yes.  Can you --

13              THE COURT:  You need to come to the podium, please.

14              MR. ALOE:  Sorry.

15              THE COURT:  Thank you.

16    CROSS-EXAMINATION

17    BY MR. ALOE:

18    Q.  The 15,000 dollars that was wired that you testified to --

19    A.  Yes?

20    Q.  What's your understanding what happened to that 15,000

21    dollars?

22    A.  I'm sorry?

23    Q.  What happened to it?  Do you know what happened to it?

24    A.  That 15,000 dollars, from what I understand, was wired to

25    87-10.

87-10 51ST AVENUE OWNERS CORP.

1    Q.  For what purpose?

2    A.  And my understanding is that 87-10 used that to pay the

3    U.S. Trustee.

4    Q.  Okay.  And was the -- was 87-10 -- is it your understanding

5    that 87-10 was an arrears of fees to the U.S. Trustee?

6    A.  Yes, it -- yes.

7    Q.  Okay.  Do you have an understanding of what the rents

8    were -- what monies were paid by 87-10 -- I mean, by Empire to

9    87-10 for the Month of May?

10   A.  I'm sorry; rephrase the question.

11   Q.  As you sit here today, can you tell me what was paid by

12   Empire to 87-10 for the month of May?

13          THE COURT:  In the month of May or for the month of

14   May?

15          MR. ALOE:  For the month of May.

16   Q.  For the month of May.  That's a yes or no.  Can you -- do

17   you know?

18   A.  I don't know off the top of my head, no.

19   Q.  Thank you.

20          MR. SPIZZ:  May I, Your Honor?  Just one?

21          THE COURT:  All right.

22   RECROSS-EXAMINATION

23   BY MR. SPIZZ:

24   Q.  All right.  I believe you said there's two apartments.  Are

25   they 2-F and 2-S that Empire uses and keeps its books and

87-10 51ST AVENUE OWNERS CORP.

1    records there?

2    A.  Correct.

3    Q.  Okay.  To your knowledge, are there any books and records

4    of the debtor, 87-10 51st Avenue Owners Corp. that are

5    currently maintained in those apartments?

6    A.  No.

7    Q.  Have there ever been to your knowledge any books and

8    records of the debtor that were maintained at those apartments?

9    A.  No.

10        MR. SPIZZ:  Thank you, Your Honor.

11   RECROSS-EXAMINATION

12   BY MR. ALOE:

13   Q.  You testified that you --

14        THE COURT:  Please get to the microphone first.

15        MR. ALOE:  Yes.

16   Q.  You testified that you will adhere to the agreement and not

17   collect rents.

18   A.  Correct.

19   Q.  Right.  Now, is it your understanding that there are some

20   apartments that Empire is retaining?

21   A.  My understanding is we are retaining two.

22   Q.  Okay.  So it is your understanding that the agreement to

23   not collect rents relates to the units that you're not

24   retaining?

25   A.  Correct.

87-10 51ST AVENUE OWNERS CORP.

1    Q.   Okay.

2              MR. ALOE:   Thank you.

3              THE COURT:   Any further questions?   Just two

4    background questions.   Could you describe your educational

5    background since completing high school?

6              THE WITNESS:   My educational background?

7              THE COURT:   Yes.

8              THE WITNESS:   Sure.   I have a bachelor of science in

9    marketing from NYU.

10             THE COURT:   And could you describe your employment

11   history since completing college?

12             THE WITNESS:   I have been in various retail

13   professions.   Currently, I work at Macy's.

14             THE COURT:   What is your position at Macy's?

15             THE WITNESS:   I work as a manager of reverse

16   logistics.

17             UNIDENTIFIED SPEAKER:   Could you just --

18             THE WITNESS:   A manager of reverse logistics, which

19   is, basically, everything that leaves the building.   So,

20   basically, it's things like UPS and package delivery and things

21   like that.

22             THE COURT:   You've indicated that you've known Mr.

23   Clausell for twenty-seven years.

24             THE WITNESS:   Correct.

25             THE COURT:   Would you describe your relationship over

87-10 51ST AVENUE OWNERS CORP.

1    those years?  Is it a -- is this a business relationship?  Is

2    it a personal relationship?  Is it a combination of any of

3    those things?

4          THE WITNESS:  It's a -- it's a combination of those

5    things.  I mean, it started out as personal relationship and

6    then I was offered the opportunity to come and sign on for

7    Empire as, at that point, he was the property manager.

8          THE COURT:  All right.  Thank you.  You're excused.

9          THE WITNESS:  Okay.

10         THE COURT:  Mr. Magaliff, call your next witness.

11         MR. MAGALIFF:  James Sheehan.

12         THE COURT:  Mr. Sheehan, come on up.

13         MR. SHEEHAN:  Can I just have some water, please?

14         THE COURT:  Why don't you take a seat?

15         MR. SHEEHAN:  I'm sorry.

16         THE COURT:  We'll get you sworn.

17         MR. SHEEHAN:  Okay, sorry.

18         THE COURT:  And then you can get yourself a cup of

19   water.  If the picture is running low, we'll be sure to refill

20   it.

21     (Witness sworn)

22         THE CLERK:  You may be seated.  State and spell your

23   name for the record.

24         THE WITNESS:  James Sheehan, president of Empire.

25   DIRECT EXAMINATION

87-10 51ST AVENUE OWNERS CORP.

1  BY MR. MAGALIFF:

2  Q.  Will you spell your name, please, Mr. Sheehan?  Your last

3  name.

4  A.  S-H-E-E-H-A-N.

5  Q.  And what is your address?

6  A.  My parents' address is in Maspeth.

7  Q.  What is the address?

8  A.  6034 61st Street in Maspeth, New York, 11378.

9  Q.  Do you live there now?

10  A.  No, I don't.

11  Q.  Where do you live?

12  A.  Wherever.  I mean, I was living in Howard Beach for the

13  past three years.

14  Q.  Where do you live now?

15  A.  Actually, I live in the building.  I took the apartment 1-

16  N.

17  Q.  1-N?

18  A.  Yes.  I've been staying there for about the past six weeks.

19  Q.  Is that an Empire apartment?

20  A.  It's -- yeah, it is.

21  Q.  Are you going to pay rent?

22  A.  No.  I would -- you know, because I have nowhere to go,

23  really.

24  Q.  Where did you live in Howard Beach?

25  A.  It was on 77th Street -- 156 -- was it 156 44 77th Street.

87-10 51ST AVENUE OWNERS CORP.

1    It was an apartment, you know?

2    Q.   No, I don't know.  That's why I'm asking.

3    A.   Yeah, I guess.  Yeah, well, that's where we lived, yeah.

4    Q.   How long did you live there for?

5    A.   I was there since February 2009.

6    Q.   And when did you move out?

7    A.   When my business collapsed in Long Island.  I had a

8    personal training studio.

9    Q.   You owned a personal training studio?

10   A.   Yeah.  It was a studio.  Yes.

11   Q.   When did that collapse?

12   A.   When the financial crisis in 2008 hit, all my clients just

13   disappeared, you know?

14   Q.   In --

15   A.   Sorry.  Oh, I thought you wanted me to get the mic closer,

16   I'm sorry.

17   Q.   Oh, I can hear you find, but --

18   A.   Oh, sorry.

19   Q.   -- if nobody else can, we'll move the mic.  Thanks.  In

20   front of you is a document that has been marked as Debtor

21   Exhibit 1.  It's a copy of the settlement agreement and mutual

22   releases.  Do you have it?

23        (Settlement agreement and mutual releases was hereby

24   marked for identification as Debtor's Exhibit 1, as of this

25   date.)

87-10 51ST AVENUE OWNERS CORP.

1  Q.  It's this document.  It's the first page and this is the

2  signature page.

3  A.  This is the first page?

4  Q.  No.  You can -- the first page looks like this.  It says

5  settlement agreement and mutual releases.

6  A.  Mutual releases?  I don't see what you mean.

7           THE COURT:  Yes, you may approach.

8           MR. MAGALIFF:  Oh, sorry.

9           THE COURT:  It's good to ask in the ordinary course.

10          THE WITNESS:  What is --

11          THE COURT:  Do you have before you the document that

12  says settlement agreement and release, Mr. Sheehan?  Look this

13  way.

14          THE WITNESS:  I'm sorry.

15          THE COURT:  Do you have this document in front of you?

16          THE WITNESS:  The settlement agrees and mutual

17  releases?

18          THE COURT:  That's it.

19          THE WITNESS:  Yes.  This is it.  Um-hum.

20          THE COURT:  Thank you.

21          MR. MAGALIFF:  Okay.

22  Q.  Now, turn to page 13, please.

23  A.  Okay.

24  Q.  Okay.  See in the left-hand column it says Empire State

25  Conglomerates, Inc.  Do you see that?

87-10 51ST AVENUE OWNERS CORP.

1    A.    Yeah.  Right.

2    Q.    Is that your signature?

3    A.    Yes, it is, sir.  Yes.

4    Q.    And you signed this document?

5    A.    Yes, I did.

6    Q.    And you're the president of Empire?

7    A.    Yes.

8    Q.    How long have you been the president of Empire?

9    A.    Since day one, I guess.

10   Q.    When was day one?

11   A.    I don't know the exact date.  I guess four years -- was it

12   three or four years?

13   Q.    I don't know.  I'm asking the questions.

14   A.    Well, I don't know the exact date.  I guess when it was

15   like incorporated.

16   Q.    When was it incorporated?

17   A.    I don't know exactly.  You know, maybe 2008 or maybe the

18   end of 2007, was it?

19   Q.    Were you the only person who incorporated Empire?

20   A.    What do you mean?

21   Q.    Were you the only shareholder when Empire was incorporated?

22   A.    Shareholder?

23   Q.    Owner.

24   A.    I'm not a shareholder.  What?  Oh, the owner?

25   Q.    Owner?

87-10 51ST AVENUE OWNERS CORP.

1    A.  I don't follow you.  I mean --

2    Q.  Do you know what a shareholder of a corporation is, Mr.

3    Sheehan?

4    A.  Someone who owns an apartment, a unit, right?

5    Q.  I'm not talking about the debtor's co-op corporation.  I'm

6    talking about a corporation in general.  Do you know what a

7    shareholder is?

8    A.  Well, it's just someone who owns the apartment, right?

9    Q.  You heard of Microsoft?

10   A.  Sure, I heard of them.  Yeah.

11   Q.  Okay.  If you own stock in Microsoft, are you a shareholder

12   of the corporation?

13   A.  I guess.  Right?

14   Q.  Okay.  Let me -- do you know what the term stockholder

15   means?

16   A.  Well, it's in a corporation, everybody -- whoever buys in

17   would have stock, right?

18   Q.  Good.  Now, let's talk about Empire.  Are you a

19   stockholder?

20   A.  I would have to be, right?  Yeah.

21   Q.  I don't know.  I'm asking you.

22   A.  Yeah.

23   Q.  It's a yes or no question.

24   A.  Yeah.

25   Q.  When Empire was incorporated, were you the only

87-10 51ST AVENUE OWNERS CORP.

1    stockholder?

2    A.  I don't know.  I'm -- I don't know.

3    Q.  Who are the stockholders of Empire today?

4    A.  I guess it would be me, Erik and Paul.

5    Q.  Okay.  And when did Paul Peterson become a stockholder of

6    Empire?

7    A.  I am not sure exactly.  I don't know.

8    Q.  Was it after Empire was formed?

9    A.  Empire was formed.  I don't know.

10   Q.  When did Mr. Garcia become a stockholder of Empire?

11   A.  I don't know.

12   Q.  Was it after Empire was formed?

13   A.  After Empire was formed?  I don't know.  Honestly, I don't

14   know.

15   Q.  When Mr. Peterson became a stockholder of Empire, did he

16   buy in?  Did he give you any money to acquire his stock?

17   A.  No.  I mean, it was just --

18   Q.  No?

19   A.  I -- no.  I mean --

20   Q.  You just gave him stock?

21   A.  No, whatever.  You know?  I didn't give him anything.

22   Q.  Well, if you didn't give him anything and he didn't give

23   you anything, how did he become a stockholder?

24   A.  I don't know.  I made no decisions at all.  I was just told

25   what to sign and where to sign.

87-10 51ST AVENUE OWNERS CORP.

1    Q.  You were told --

2    A.  I don't even know what I got myself into.  Sorry.

3    Q.  Who told -- when you say you were told what to sign and

4    where to sign, what document or documents are you referring to

5    that you were told what and where to sign?

6    A.  Whatever Roberto Valdes put in my face, I signed it.

7    Q.  Roberto Valdes?  Is that Robert Valdes-Clausell?

8    A.  That's correct, sir.  I call him Roberto.

9    Q.  Okay.  We'll come back to that, but let me finish with the

10   easy stuff.

11   A.  Can I take -- can I take a water?

12   Q.  By all means.

13   A.  Dammit.  Little shaky.  Yup.  Sorry, I didn't mean to

14   curse.

15   Q.  You ready?

16   A.  Yeah, go.

17   Q.  Thank you.  Look at the document that we were talking

18   about, okay?  Underneath where you singed the president of

19   Empire State Conglomerates, three lines down below that, is

20   that also your signature, James Sheehan?

21   A.  Yeah, I just signed that today.  Sure.

22   Q.  And you signed it as a member of the board of directors of

23   87-10 51st Avenue Owners Corporation?

24   A.  Yeah, that's what it says here.  Right.

25   Q.  Okay.  And do you know what this document is that you

87-10 51ST AVENUE OWNERS CORP.

1   signed?

2   A.  Well, it's a release, right?

3   Q.  Well, I'm asking you.  It's a settlement agreement.

4   A.  Right.

5   Q.  Are you aware of what things are being settled?  Yes or no?

6   A.  That -- my understanding is that this will, you know,

7   that -- you know, I guess we're just turning over seventy-nine

8   apartments, right?

9   Q.  Empire is turning over seventy-nine apartments.

10  A.  Right.  Yes.

11  Q.  To the debtor.  The co-op corporation, correct?  87-10 51st

12  Avenue Owners Corp., correct?

13  A.  I guess.

14          MR. MAGALIFF:  Your Honor, before we go any further,

15  I'd like to move the admission of the settlement agreement and

16  mutual release which has now been identified by the three

17  Empire principals into evidence as Exhibit 3, I guess.

18          THE COURT:  It's been marked for identification as

19  Exhibit 1.

20          MR. MAGALIFF:  Correct.  Well --

21          THE COURT:  Any objection?  Without objection, it will

22  be received as Exhibit 1.

23      (Settlement agreement and mutual release was hereby

24  received into evidence as Debtor's Exhibit 1, as of this date.)

25          THE COURT:  Please proceed.

87-10 51ST AVENUE OWNERS CORP.

1          MR. MAGALIFF:  Thank you, Your Honor.

2    Q.  Let's go back to what you signed and when.  You said that

3    Robert Valdes-Clausell gave you some papers to sign?

4    A.  Whatever he told me to sign, they're just signed.

5    Q.  Do you know what it was?

6    A.  Well, it was leases and things, you know.

7    Q.  Leases --

8    A.  And --

9    Q.  -- and things?

10   A.  Um-hum.

11   Q.  What kind of things, Mr. Sheehan?

12   A.  Whatever.  I trusted him.  He came to me with this idea and

13   said to get the co-op going.  I said, "As long as it's legal.

14   I don't want to get in any trouble."  "Oh," he said, "It's

15   fine."  You know?

16   Q.  Did you talk to a lawyer?

17   A.  No.

18   Q.  Did he have a lawyer with him?

19   A.  When?

20   Q.  When he told you everything was fine and it was legal?

21   A.  No.  I just took his word for it because I always

22   considered him very righteous and on the up and up, you know?

23   Q.  Righteous, indeed.  How long have you known Mr. Valdes-

24   Clausell?

25   A.  Oh, since about 1993.

87-10 51ST AVENUE OWNERS CORP.

1    Q.   How old are you?

2    A.   I'm forty.

3    Q.   How old is he?

4    A.   Fifty-two, I think.

5    Q.   How did you meet?

6    A.   I used to actually work in the building.  I did the

7    cleaning and then I worked there a few years and me and Rob,

8    you know, became friends and stuff like that, you know?

9    Q.   Stuff like that.  You want to elaborate?

10   A.   No.  What do you mean?  Just friends.

11   Q.   Did you ever do business with him before the Empire deal?

12   A.   He'd use me for like construction jobs and once in a while,

13   you know, like that.

14   Q.   Around the building?

15   A.   No.  Just -- he a -- I think another company or do like

16   maybe demolition.  I showed him how to work out with weights a

17   little bit and stuff like that.

18   Q.   What kind of company did he have?

19   A.   He's a contractor, you know?

20   Q.   When did Mr. Peterson become a stockholder of Empire?

21   A.   I don't know.  At some point, but I don't know the exact

22   date.

23   Q.   And did that happen because you signed a couple of things

24   that Mr. Valdes-Clausell gave you to sign?

25   A.   I don't know.

87-10 51ST AVENUE OWNERS CORP.

1    Q.  Prior to forming Empire and acquiring the eighty-one units,

2    did you have any experience owning or managing property?

3    A.  No.

4    Q.  You must have thought this was a great gift, right?

5    A.  Yeah.  I just assumed it was all right.  Thought it was an

6    opportunity, you know?

7    Q.  Did you think you were going to make some money?

8    A.  Eventually, he said the money would be there someday, you

9    know?

10   Q.  Did he pay you cash also?

11   A.  Yes.

12   Q.  How much?

13   A.  Between two and three hundred dollars a week just for basic

14   living expenses.

15   Q.  And this was every week?

16   A.  Every week, yeah.

17   Q.  Starting when?

18   A.  Right from around the time, like, in February 2009, around

19   there.

20   Q.  February of 2009?

21   A.  Yeah.

22   Q.  And how did you earn a living prior to February of 2009?

23   A.  Well, I had the studio; the personal training studio.

24   Q.  Oh, so Mr. Clausell started paying you cash after your

25   studio failed?

87-10 51ST AVENUE OWNERS CORP.

1  A.  Yeah.  It was sort of an arrangement.  He said just, you

2  know, give you cash, you know?

3  Q.  Nice guy, huh?

4  A.  I thought it was all right, you know.

5  Q.  Did he ask you to do anymore work in return for these cash

6  payments?

7  A.  No, just to assist with Empire and stuff.

8  Q.  To assist with Empire.  Was he running Empire?  That's

9  okay, you can tell us.

10  A.  Well, I mean, when you say running it --

11  Q.  Was he making the decisions about Empire?

12  A.  Yes.

13  Q.  Did he have signature authority on the bank accounts?

14  A.  Signature authority?

15  Q.  Could he write checks?

16  A.  I don't know.

17  Q.  You don't know?

18  A.  Write checks?

19  Q.  Could he take money out of Empire's bank accounts?

20  A.  Well, he came with me to the bank always.

21  Q.  He always came with you to the bank?

22  A.  Except when he was away on maybe a wedding or something

23  like that, then he would instruct me to go there, you know?

24  Q.  And would he instruct you to take money out of the bank?

25  A.  Yeah, whatever was needed to be taken out, you know?

87-10 51ST AVENUE OWNERS CORP.

1    Q.  And when you took out that money from the bank that Mr.

2    Clausell instructed you to take out, what did you do with it?

3    A.  Well, it was, you know -- he took it.

4    Q.  He took it.

5    A.  Yeah.

6    Q.  What was the largest amount that you recall at one time

7    taking out of Empire's bank account and giving to Mr. Clausell?

8    A.  Cash or wire.  Like --

9    Q.  Let's start with cash.  The largest amount you can

10   remember.

11   A.  It may be like in chunks of like maybe 8,000 something.

12   Q.  8,000?

13   A.  Or it depends.  Whatever was needed, like --

14   Q.  And what about wire transfers.  What's the largest wire

15   transfer you ever made from an Empire account to Mr. Valdes-

16   Clausell?

17   A.  Transfers were made -- like the largest ever?

18   Q.  The largest ever.

19   A.  Maybe 50,000.

20   Q.  Five-zero?

21   A.  Fifty grand, yeah.

22   Q.  At one time?

23   A.  I believe, yeah.

24   Q.  And these were made to Mr. Clausell personally to his

25   accounts?

87-10 51ST AVENUE OWNERS CORP.

1   A.   No.   I don't know where exactly they went.

2   Q.   Well, the cash that you gave him, that was directly to him,

3   right?

4   A.   Right, but -- yeah.   I mean --

5   Q.   Did Mr. Valdes-Clausell ever tell you that you should take

6   out less than 10,000 dollars in cash at any one time?

7   A.   Yeah.

8   Q.   Well, let me rephrase -- I'm sorry, what?

9   A.   Yeah, I believe so.

10   Q.   Did he ever tell you not to take out more than 10,000

11   dollars in cash at any one time?

12   A.   That never came up.   We usually never needed that much, you

13   know, anyway, I guess.

14   Q.   Over the years, have you given Mr. Valdes-Clausell more

15   than 100,000 dollars in cash from Empire accounts?

16   A.   I don't know how much it would add up to, you know.

17   Just --

18   Q.   Have you given Mr. Valdes-Clausell more than 100,000

19   dollars in wire transfers from Empire accounts?

20   A.   Well, I don't -- when you say given to him, it wasn't given

21   to him.   I don't know where they were wired, but --

22   Q.   You just wired it out?

23   A.   Yeah.

24   Q.   But the cash you gave to him, right?

25   A.   Yeah.

87-10 51ST AVENUE OWNERS CORP.

1    Q.  All right.  How many times do you think you gave Mr.

2    Valdes-Clausell at least 5,000 dollars in cash?

3    A.  It's hard to say.  It was just, you know -- there's no way

4    exactly to tell.

5    Q.  Was it at least once a month?

6    A.  It was always difference.  You know, he claimed that it was

7    going back -- he needed it for the building to fix everything

8    up, I think.

9    Q.  That's what he told you?

10    A.  Yeah.

11    Q.  Are you aware that Empire State Conglomerates owes 87-10

12    more than 500,000 dollars?

13    A.  I found that out recently.  I didn't know what it was

14    really all about.

15    Q.  You had no idea?

16    A.  You want to tell me?

17    Q.  No.  I'm asking you.

18    A.  I don't -- I don't know the whole story.  There was some

19    problems with the bank, maybe, or something.

20    Q.  Do you know that Empire State Conglomerates signed

21    promissory notes to 87-10 in connection with the acquisition of

22    the apartments?  Do you know that?

23    A.  No.

24    Q.  Don't know that?

25    A.  I don't.

87-10 51ST AVENUE OWNERS CORP.

1    Q.  You don't know if that was one of the things that was put

2    in front of you to sign?

3    A.  It could have been.

4    Q.  When did you first learn that Empire owes money to 87-10?

5    A.  I found out, you know, I guess recently, but I didn't have

6    full understanding of the situation, you know?

7    Q.  You're the person that had sole responsibility for managing

8    Empire's accounts?

9    A.  Um-hum.

10   Q.  Is that a yes or a no?

11   A.  Yes.

12   Q.  You and Mr. Clausell.

13   A.  You know, well -- I don't know.

14   Q.  Could Mr. Clausell go to the bank and take money out of

15   Empire's accounts without you?

16   A.  I believe so.

17   Q.  Did he have a debit card for an Empire bank account?

18   A.  Yes.

19   Q.  Do you have a debit card?

20   A.  No.

21   Q.  What about Mr. Peterson?

22   A.  I don't know.

23   Q.  What about Mr. Garcia?

24   A.  I don't know.

25   Q.  So Mr. Clausell could have taken cash out of him for his

87-10 51ST AVENUE OWNERS CORP.

1    bank accounts that you know nothing about, right?

2    A.   Correct.

3    Q.   Did you look at the bank statements on a monthly basis?

4    A.   No.

5    Q.   Who did?

6    A.   I don't know.

7    Q.   Did they go to Mr. Clausell?

8    A.   I am not sure who was handling that.

9    Q.   They didn't go to you?

10   A.   No.

11   Q.   Did they go to the accountant?

12   A.   I just -- I really don't know.

13   Q.   Mr. Sheehan, are you aware that there was an order entered

14   by the bankruptcy court on June 1 of this year, that's a week

15   ago Friday, that prohibited Empire and its officers and

16   directors, that is you, Mr. Peterson and Mr. Garcia, from

17   interfering with the collection of rent from Empire tenants by

18   the property manager?  Did you know about that?

19   A.   There was an interference.

20   Q.   Did you know that there was an order entered that

21   prohibited you from interfering with the collection of rents?

22   Look at me, please.

23   A.   Sorry.

24   Q.   Do you know that?

25   A.   Well, I had some understanding that it was --

87-10 51ST AVENUE OWNERS CORP.

1    Q.  Did your attorney -- or Empire's attorney -- send you a

2    copy of that order?

3           THE COURT:  If parties -- excuse me, Mr. Magaliff.  If

4    anyone needs to confer, they may step out of the courtroom.

5    Thank you.  I'd like counsel to stay at counsel table, please.

6    If you need to confer with your client, you may step out of the

7    courtroom and do so in an appropriate and private way.

8           Please proceed, Mr. Magaliff.

9           MR. MAGALIFF:  Thank you, Your Honor.

10   Q.  Did your attorney --

11          THE COURT:  For the sake of a clear record, I was

12   speaking to Mr. Clausell's counsel.

13   Q.  Mr. Sheehan, did your attorney or Empire's attorney, I

14   should say, either Mr. Levine or Mr. Aloe, call you or send you

15   an e-mail to tell you that this order was entered that

16   prohibited Empire from interfering with the collection of

17   rents?

18   A.  I don't believe so.  Honestly, I don't believe so.

19   Q.  Did you get a copy of it in the mail?

20   A.  No.

21   Q.  Did you talk about it with Mr. Garcia or Mr. Peterson?

22   A.  I am not sure.  You know, I knew there was problems at that

23   point.  I knew everything was going wrong, like --

24   Q.  Did you know that Mr. Peterson had delivered a letter to

25   Empire's tenants on May 31 directing them to continue to pay

87-10 51ST AVENUE OWNERS CORP.

1    rents to Empire?

2    A.  I believe I know that, yeah.

3    Q.  Did you hear that before today?

4    A.  I've heard it, yeah.

5    Q.  So you generally did talk with Mr. Garcia and Mr. Peterson

6    about what was going on with Empire, is that true?

7    A.  Sure.  I mean, at that point, I had to know, you know,

8    everything.

9    Q.  Well, didn't you have to know everything all along or was

10   it only recently?

11   A.  You know, I just never paid attention to everything, you

12   know?

13   Q.  Well, that I believe.  As you sit here today --

14        THE COURT:  Mr. Magaliff -- Mr. Magaliff, I'm going to

15   encourage you to ask questions, but not make comments, as you

16   are examining the witness.

17   Q.  Mr. Sheehan, as you sit here today, do you understand that

18   Empire and you and Mr. Peterson and Mr. Garcia cannot interfere

19   with the collection of rents from Empire tenants?

20   A.  Yes, sir.

21   Q.  And do you agree and consent to the entry of an order by

22   the bankruptcy court that prohibits Empire, yourself, Mr.

23   Peterson and Mr. Garcia from interfering with the collection of

24   rents?

25   A.  Yes, sir.

87-10 51ST AVENUE OWNERS CORP.

1    Q.  And do you agree and consent to the tenants in the

2    apartments that Empire gets to keep, paying their rent to the

3    property manager?

4    A.  Yes.

5    Q.  Okay.  Now, you heard Mr. Peterson testify that about

6    104,000 dollars was collected from Empire tenants in May.  Do

7    you recall that?

8    A.  I don't know what was collected.

9    Q.  You have no idea how much rent was collected in May.

10   A.  No.

11   Q.  Do you know how much money Empire paid to 87-10 in May?

12   A.  To 87-10?  No.  No.

13   Q.  Do you know how much is in Empire's bank accounts today?

14   A.  I don't.  I would imagine it's -- I don't know.

15   Q.  I don't want you to guess.  You don't know.

16   A.  Yeah.

17   Q.  Do you know how much has been turned over totally -- in

18   total, in the month of May, how much has been turned over to

19   87-10?

20   A.  Turned over?  I don't --

21   Q.  Paid.  How much money has been paid to 87-10 in May?

22   A.  I don't know.

23   Q.  Do you know how much Empire spent anywhere else in May?

24   A.  I don't know.

25   Q.  You heard Mr. Peterson testify that you're the guy who

87-10 51ST AVENUE OWNERS CORP.

1  keeps the accounts and writes the checks and has sole signature

2  authority.  So how do you not know where the money went?

3  A.  I just wasn't, you know, paying attention.

4  Q.  Is it because Mr. Clausell told you where to send the

5  money?

6  A.  What money?

7  Q.  Any money that Empire collected from its tenants in May.

8  A.  In May.

9  Q.  Did Mr. Clausell tell you what to do with that money?

10  A.  Well, it was -- I don't know.  I don't know.

11  Q.  Did you pay any money to Mr. Clausell in May?  Give him any

12  cash?

13  A.  What do you mean pay?

14  Q.  Did you give Mr. Clausell any cash in May from Empire's

15  bank accounts?

16  A.  I don't know exactly.

17  Q.  You don't know if he gave him cash?  You just testified

18  that you've been giving him cash.

19  A.  Oh, yeah, but I don't know -- was it May or something?

20  Q.  Let's try this again.

21  A.  Yup.

22  Q.  In May --

23  A.  Yeah.

24  Q.  -- did you give Mr. Clausell any cash?

25  A.  I don't -- I don't believe so.  No, I guess so, yeah.  In

87-10 51ST AVENUE OWNERS CORP.

1    May, yeah.

2    Q.  How much?

3    A.  I don't know.  I can't keep track.

4    Q.  Was it more than 10,000 dollars?

5    A.  Could have been.  I don't --

6    Q.  Did you wire any money to Mr. Clausell in May?  Oh, you can

7    close those, by the way, and just leave them there, if they're

8    getting in your way.

9    A.  When you say wire, I don't know.  I don't think money was

10   wired to him.

11   Q.  So in May, you paid cash to Mr. Clausell, but no money was

12   wired from Empire accounts?

13   A.  Money was wired -- I am not sure, really.  I am not sure.

14   Q.  Do you know if Mr. Clausell used his debit card and took

15   any money out of Empire accounts in May?

16   A.  I don't know.

17   Q.  When was the last time you talked to Mr. Clausell?

18   A.  The other day.

19   Q.  What did you talk about?

20   A.  I told him I was scared about going to court and stuff,

21   because -- you know?  I didn't --

22   Q.  Why were you scared?

23   A.  Because I didn't know what I was in for, you know?  And I

24   have -- I don't feel well.  I get panic attacks and stuff.

25   Q.  What did he tell you?

87-10 51ST AVENUE OWNERS CORP.

1    A.  Just not to, basically -- you know, not go.  We were going

2    to --

3    Q.  Did you know you were supposed to be here last Friday?

4    A.  One week ago?

5    Q.  One week ago, that there was an order that the bankruptcy

6    court entered directing you to be here?

7    A.  No.

8              UNIDENTIFIED SPEAKER:  May 11th.

9              MR. MAGALIFF:  I'm sorry, May 11th.  Thank you.

10   Q.  May 11th.

11   A.  I understood there was court going on, but I didn't know if

12   it was important for me to be here or not.

13   Q.  So you didn't know that there was an order that had been

14   entered that directed you to be here on May 11th?

15   A.  Not really.  I mean --

16   Q.  Did you --

17   A.  I believe Erik told me a couple of days before that, "You

18   should be there," but I said, you know --

19   Q.  So how come you didn't come?

20   A.  I didn't -- I don't know.  Just get very nervous in

21   courtrooms -- anything that --

22   Q.  Did Mr. Clausell tell you not to come on May 11th?

23   A.  Yeah.

24             MR. MAGALIFF:  I have no further questions, Your

25   Honor.

87-10 51ST AVENUE OWNERS CORP.

1    CROSS-EXAMINATION

2    BY MR. SPIZZ:

3    Q.  Isn't it a fact that Mr. Clausell is the one who runs the

4    company and takes care of the finances with respect to Empire?

5    Isn't that the truth?

6    A.  Yes, sir.

7    Q.  Okay.

8        THE COURT:  Mr. Spizz, please use the microphone when

9    you put questions to the witness.

10   Q.  Now, you've been truthful so far, correct?

11   A.  Yes.

12   Q.  Okay.  So Mr. Clausell would tell you what checks to sign

13   when a payment had to be made?

14   A.  A payment?

15   Q.  Well, you did sign checks, right?

16   A.  Yes.

17   Q.  And did Mr. -- who wrote out those checks?

18   A.  What --

19   Q.  Checks?  The Empire wrote checks.  Didn't you -- didn't

20   Empire make out checks?

21   A.  Checks to who?

22   Q.  Well, take a look -- I think you have a document there

23   that's been marked as Exhibit 2.  Do you see the check?

24       MR. SPIZZ:  May I approach the witness, Your Honor?

25       THE COURT:  Let's see if we can simply explain, as

87-10 51ST AVENUE OWNERS CORP.

1    opposed to have you point.

2         MR. SPIZZ:  All right.

3         THE COURT:  I also need to remind the parties that, in

4    view of the lateness of the hour, we are not going to be able

5    to go very much longer --

6         MR. SPIZZ:  Yes.

7         THE COURT:  -- tonight.  It may be that I have a

8    sufficient record in order to rule on the matters before me and

9    it may be that, based on the record that has been made, they

10   can be addressed, at least provisionally, in a straight-forward

11   way.

12        MR. SPIZZ:  Okay.

13        THE COURT:  So, and we will not hesitate to continue

14   to address any and all matters that need to be addressed,

15   including the context of any non-compliance with this Court's

16   prior orders.

17        But I'd like you to direct the witness as opposed to

18   approach the witness as to what you would like him to look at.

19   Q.  Take a look at the document that's marked as Exhibit 2 for

20   identification.  It's a check for 60,000.  Do you see it?  Take

21   a look to your left.

22        (Check for 60,000 dollars was hereby marked for

23   identification as Debtor's Exhibit 2, as of this date.)

24   A.  This one?

25   Q.  Well, there's a check.  Do you see the copy of a check?  Go

87-10 51ST AVENUE OWNERS CORP.

1    through the documents.  No, the next document.  Right there.

2    A.  That?

3    Q.  See that?

4    A.  Oh, that?

5    Q.  Yeah.  Is that your signature?

6    A.  That's what we would call the bank signature.

7    Q.  Well, what does that mean, the bank signature?

8    A.  I don't know.  It's like that's what he told me to -- he

9    made up that signature and told me to sign it like that.

10    Q.  Do you sign -- does Mr. Clausell ever sign checks?

11    A.  I don't know.

12    Q.  Okay.  But is that your signature on there?

13    A.  Right.  That's the bank signature.

14    Q.  Okay.  Now --

15         THE COURT:  Mr. Sheehan, just for the sake of a clear

16    record, you indicated "he" a couple of answers ago.  Who were

17    you referring to?  Mr. Clausell?

18         THE WITNESS:  I don't remember.  He?

19    Q.  Yes.  You said he told you the banks -- to make the bank

20    signature.

21    A.  Oh, yes.

22         THE WITNESS:  Yes, ma'am.  Yes.

23         THE COURT:  Okay.

24         THE WITNESS:  Yeah.

25    Q.  Now, Mr. Clausell would go with you to the bank and you

87-10 51ST AVENUE OWNERS CORP.

1    would withdraw cash, is that correct?

2    A.  Yeah.

3    Q.  And you'd do that at least once a month?

4    A.  Probably more often than that.

5    Q.  More often than that.  And were you paid cash from those

6    monies?

7    A.  Yes.

8    Q.  And how much would you get paid again?

9    A.  Like between two- and three-hundred dollars a week.

10   Q.  All right.  And then also we heard Mr. Peterson and Mr.

11   Garcia also got paid, right?

12   A.  Right.

13   Q.  Were there any monies paid to board members, do you know?

14   A.  No.  I don't know.

15   Q.  You're not aware of anything like that?

16   A.  I don't know.  Yeah.

17   Q.  All right.  But each month, would you write checks?

18   A.  When you say you write checks, what do you --

19   Q.  Excuse me.  There were payments made -- there were payments

20   made to the co-op each month, correct?  To the debtor; 87-10.

21   There were payments made each month, right?

22   A.  I guess.

23   Q.  You don't know.

24   A.  I don't know.

25   Q.  You didn't handle them.

87-10 51ST AVENUE OWNERS CORP.

1    A.    I mean, what -- what --

2    Q.    Who made those payments?  Who made the wire transfers to

3    the debtor each month?

4    A.    To the debtor?  What --

5    Q.    I'm sorry; the building is 87-10.  Right?

6    A.    Yeah.

7    Q.    Okay.  And you had -- you knew you had to pay maintenance

8    payments, right?  There were maintenance payments by Empire?

9    A.    Maintenance?

10    Q.    The truth is, Mr. Clausell handled all the finances for

11    Empire State Conglomerates.  Is that the truth?

12    A.    Yes, sir.

13    Q.    All right.  Now, do you know where the records are of

14    Empire?

15    A.    No.

16    Q.    Okay.  What is your education background?

17    A.    Do I have to say?

18    Q.    Please.

19            THE COURT:  It's appropriate -- let me ask that

20    question, if I may.  What's your educational background?

21            THE WITNESS:  I -- ninth grade.

22            MR. SPIZZ:  Okay.

23            THE COURT:  Ninth grade.  Did you have any high --

24    ninth grade was the last year you attended?

25            THE WITNESS:  Right.

1          THE COURT:  Formal education?

2          THE WITNESS:  Yeah, pretty much.

3          THE COURT:  Okay.  Thank you.

4          THE WITNESS:  Yeah.

5          THE COURT:  Have you had any other kind of training,

6   including trade school?

7          THE WITNESS:  No.

8          THE COURT:  All right.  Thank you.  Mr. Spizz, you can

9   move to --

10         MR. SPIZZ:  Thank you.

11  Q.  And you used to work as the -- I believe the janitor at the

12  building?

13  A.  Right.

14  Q.  Okay.  And Mr. Clausell -- several years ago, Mr. Clausell

15  asked you to become the president of this corporation, Empire?

16  A.  Yes.

17  Q.  But since the beginning, since Empire has been formed, Mr.

18  Clausell has been the person who has been in charge of all the

19  finances and makes the decisions of what gets paid and what

20  doesn't get paid, is that true?

21  A.  I would say so.

22  Q.  Well, you heard Mr. Garcia say it's not him.  You heard Mr.

23  Peterson say wasn't him.  Did you hear that?

24  A.  Right.

25  Q.  So who else is there?  Who was making the decisions on

87-10 51ST AVENUE OWNERS CORP.

1    behalf of Empire as to where the money went?

2    A.   Valdes.

3    Q.   Do you know how much money was collected every month?   Do

4    you have any idea?

5    A.   I don't, sir.

6    Q.   You don't know?

7    A.   I don't.

8    Q.   Okay.  So do you know how much money was spent every month?

9    A.   No.

10   Q.   Okay.  Are you aware there's two apartments, 2-F and 2-S at

11   the building that Empire keeps records there?  Are you aware of

12   that?

13   A.   I -- yeah.  I saw, you know, some files there.

14   Q.   Do you know of any records of the building itself?  When I

15   say the debtor, 87-10 Avenue Owners Corp.  Are there any books

16   or records stored there?

17   A.   In those apartments?

18   Q.   Yeah.

19   A.   I wouldn't know.  I never looked.

20   Q.   Okay.  Were you ever -- were you ever aware that any

21   computers and other documents that which belonged to the

22   building were removed and put into apartments that belonged to

23   Empire?  Were you ever told that?

24   A.   Computers?

25   Q.   Yeah.

87-10 51ST AVENUE OWNERS CORP.

1   A.  Computers moved around?  Can you repeat the question, sir?

2   Q.  Yeah.  Do you ever -- were you ever aware that there were

3   computers that used to belong to -- belong to the debtor.  And

4   when I say the debtor, I'm talking about the building, the co-

5   op building, that were removed and brought to those apartments,

6   either 2-S or 2-F?  Were you aware of that?

7   A.  I mean, there's a computer in -- wait.  There's computers

8   in 2-F.

9   Q.  Do you know whose computers those are?

10  A.  No.

11  Q.  Do you know whether they're Empire's computers?

12  A.  In 2-F?

13  Q.  Yeah.

14  A.  No.  I just -- they were there.  I don't know.

15  Q.  But you don't know who they belonged to?

16  A.  No.

17  Q.  Do you know when they were brought there?

18  A.  I don't.

19          THE COURT:  We're going to have to suspend this fairly

20  soon.  I do need to give you some direction with respect to the

21  matters before me.  We are constrained by the lateness of the

22  hour.

23          MR. SPIZZ:  Yes.

24          THE COURT:  I do think a sufficient record has been

25  made for --

87-10 51ST AVENUE OWNERS CORP.

1          MR. SPIZZ:  Yes.

2          THE COURT:  -- for purposes of the questions posed by

3    the orders to show cause, at least with respect to the prospect

4    of interim relief.

5          MR. SPIZZ:  Can I just --

6    Q.  Mr. Magaliff asked you some questions.  I am not sure if --

7    I am not sure he went all the way -- with regard to the

8    agreement.  Take a look at the agreement, the one you signed.

9    The one that says release number one; Exhibit 1.  See that one?

10   You signed that, correct?  That's the one.  You've got it in

11   front of you.  You signed it, right?

12   A.  There's no signature here.

13   Q.  No.  No.  Take a look through the pages, sir.

14          UNIDENTIFIED SPEAKER:  Page 13.

15   Q.  13.  13, counsel said.

16   A.  13?  Oh, yeah, right.

17   Q.  Is that your signature?

18   A.  Where it says president?

19   Q.  Yeah.  Is that your signature?

20   A.  Yup.  At the top, yeah.

21   Q.  Oh, did you sign that as --

22   A.  Yeah, just now.

23   Q.  That is your sign?

24   A.  Yup.

25   Q.  And did you also sign as a board member?

87-10 51ST AVENUE OWNERS CORP.

1   A.  Yeah, right.

2   Q.  Okay.  Now, did you read the document before you signed it?

3   A.  Not really, no.

4   Q.  Was it explained to you, the document?

5   A.  Yeah.  Aloe.

6   Q.  Mr. Aloe, your -- he's Empire's lawyer?

7   A.  You know --

8   Q.  He explained to you what the document --

9   A.  It was before --

10          THE WITNESS:  What's your name, sir?  You -- you --

11          UNIDENTIFIED SPEAKER:  My name?

12          THE WITNESS:  -- told me to sign it.  No, the man

13  sitting next to you.

14          MR. MAGALIFF:  Howard Magaliff?

15  Q.  Mr. Magaliff?

16  A.  Right.  He was there and told me -- he told me where to

17  sign.

18  Q.  But had you ever read this document?

19  A.  Not really.  I just assumed that Erik and Paul were telling

20  me to sign it, so --

21  Q.  Well, did your counsel advise you to sign it?  Why -- why

22  did you sign the document?

23  A.  Because they said that was the release.  That's what -- you

24  know, the --

25  Q.  Have you signed this document under your own free will?

87-10 51ST AVENUE OWNERS CORP.

1   A.  Yeah.  I was told to sign it.

2   Q.  Do you intend to be bound by the terms and conditions of

3   this document?

4   A.  What -- what's bound?

5   Q.  Well, do you realize Empire is transferring seventy-nine

6   units?

7   A.  Oh, yeah.  Yeah.

8   Q.  You know that?

9   A.  Yeah.

10  Q.  And is keeping two?

11  A.  Right.

12  Q.  And it can't collect any more rents?

13  A.  Correct.

14  Q.  And it hasn't been able to collect rents since May?  You

15  know all that?

16  A.  Can I take some water?

17  Q.  Please.  Please.

18  A.  Yeah.

19  Q.  And you've agreed to that?

20  A.  Yeah.

21  Q.  And there's releases going on.  You said you wanted a

22  release.  What do you understand a release to be?

23          UNIDENTIFIED SPEAKER:  Objection.  It calls for a

24  legal conclusion.

25          THE COURT:  If you have an understanding of that

87-10 51ST AVENUE OWNERS CORP.

1    provision and you can describe it without revealing any advice

2    you got in your capacity as president of Empire, you can

3    answer.  If you don't know, that's the answer you should give.

4          THE WITNESS:  I don't know.

5    Q.  Okay.  Because you --

6          THE COURT:  Mr. Sheehan, have you ever read the

7    document that you signed?

8          THE WITNESS:  This one?

9          THE COURT:  Do you remember reading it?

10         THE WITNESS:  No.  I just assumed that's what they

11   wanted me to do.  It's --

12         THE COURT:  Okay.  We're going to go just another

13   couple minutes.  Questions really should come from the lawyers;

14   my job is to be sure that I understand the record sufficiently

15   to make a good decision.  So I thank you for being responsive

16   to my questions during Mr. Spizz's questions.

17         Mr. Spizz, I'll give you just another minute or two.

18         MR. SPIZZ:  Okay.

19         THE COURT:  We need to manage the time.  I'd like to

20   give five minutes to --

21         MR. SPIZZ:  Okay.

22         THE COURT:  -- bank's counsel if we can.  That's for

23   outside the outer parameter of timing that I had planned for

24   this and can impose on my colleagues for this.

25         MR. SPIZZ:  Yes.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Is it your intention to be bound by this agreement?  Is

2    that why you signed it?

3    A.    When you say bound, like, I --

4    Q.    Well, what do you -- when you signed the agreement, what

5    do you understand?

6    A.    Well, that's what --

7    Q.    Excuse me.  What do you understand the significance --

8             THE COURT:  Mr. Spizz.

9    Q.    -- of your signing?

10            THE COURT:  Mr. Spizz, please don't interrupt the

11   witness when he's beginning an answer.

12            MR. SPIZZ:  I apologize, Judge.

13            THE COURT:  To the witness as well.

14   A.    You know, it was a release.  That's all I --

15   Q.    Okay.  I don't want to know what Mr. Aloe said, okay.  I

16   don't want to know the details.  But is it fair to say that you

17   discussed this agreement with Mr. Aloe before signing it?  Is

18   that a fair statement?

19   A.    I spoke to Aloe yesterday on the phone.  And I don't know

20   how much we talked about the release, but --

21   Q.    Was that the first time you ever spoke to Mr. Aloe about

22   this agreement?

23   A.    About this agreement --

24   Q.    Yes.

25   A.    Yeah.  Right.  Yeah.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Do you agree to transfer the seventy-nine apartments?

2    A.    That's fine with me.

3    Q.    Okay.  And you agree to turn over all the rents from those

4    apartments?

5    A.    Yeah.

6    Q.    Okay.  And do you understand that you're getting a

7    release -- no one can sue you now for anything that happened in

8    the past?

9    A.    That's it?

10   Q.    Part of the agreement.  Do you understand that to be part

11   of the agreement?

12   A.    Well, I do now.

13   Q.    You didn't know?  When you said you were getting a

14   release, what did you mean by that?

15   A.    A release.  You know, just, I guess release from this

16   mess.  I don't know.

17   Q.    All right.  Okay.  Yeah.  So you signed this agreement

18   under your own free will, right?

19   A.    Right.  Today.

20   Q.    Okay.

21   A.    I signed.  Yeah.

22   Q.    And you signed it on the advice of counsel?

23   A.    Counsel?

24   Q.    On the advice of Mr. Aloe, did you sign it?

25   A.    Yeah.  Aloe was there.  Yeah.  Yeah.

87-10 51ST AVENUE OWNERS CORP.

1    Q.    Okay.  No further questions.

2         THE COURT:  Mr. Weinstein, I give you a couple of

3    minutes.  That's all I can do in view of the lateness of the

4    hour.

5         MR. WEINSTEIN:  Okay.

6    CROSS-EXAMINATION

7    BY MR. WEINSTEIN:

8    Q.    Now, you did feel and believe that it's important that you

9    receive the release, is that right?

10   A.    Right.  That's what I've been told -- today especially.

11   Yeah.

12   Q.    And that was explained to you, correct?

13   A.    Right.

14   Q.    And the transfer of the apartments was explained to you,

15   correct?

16   A.    Right.  It was all but two.  Right.

17   Q.    Right.

18   A.    Yeah.

19   Q.    Right.  And that two were going to be maintained, correct?

20   A.    Right.

21   Q.    And you signed the document, correct?

22   A.    Yeah.

23   Q.    Did you have weekly meetings about Empire with Paul

24   Peterson?

25   A.    It was never meetings, it was once in a while I'd ask him

87-10 51ST AVENUE OWNERS CORP.

1    questions, how everything was going.

2    Q.   How often do you think you spoke with Paul Peterson over

3    the last four years?

4    A.   It's hard to say.  He's kind of like a friend too;

5    sometimes I'd text him just to say hello.

6    Q.   Okay.

7          MR. WEINSTEIN:  Okay.  I have nothing further.

8          THE COURT:  Thank you.

9          Mr. Aloe.

10         Well, other parties who have waived in the past --

11   view waiver of Mr. Miller.

12         Mr. Aloe.

13         You can waive if you wish.

14         Mr. Aloe.

15   CROSS-EXAMINATION

16   BY MR. ALOE:

17   Q.   Are you familiar with an e-mail address esc@nycmail.com?

18   A.   E -- can you say it --

19   Q.   E-S-C --

20   A.   E-S-C --

21   Q.   -- at nycmail.com.

22   A.   I don't believe so.  No.

23   Q.   So --

24   A.   What's that?

25         THE COURT:  It's not your job to ask questions.  You

87-10 51ST AVENUE OWNERS CORP.

1    have a big enough job giving answer, Mr. Sheehan.

2            THE WITNESS:  Sorry, ma'am.  Sorry.  Sorry.

3    Q.    Do you know whether Empire had an e-mail address?

4    A.    Yeah.  I just saw it the other day.

5    Q.    Okay.

6    A.    I w -- I --

7    Q.    Do you know what that e-mail address is?

8    A.    I was in -- I -- it was in 2 -- 2S, so I snooped around on

9    the computer and I found out.  And I just saw it there.

10   Q.    So you didn't have access to Empire's e-mails?

11   A.    No.

12   Q.    Okay.  Had you provided to our office a personal e-mail or

13   a phone number?

14   A.    I'm sorry?

15   Q.    Did you ever provide a personal e-mail?

16   A.    I don't believe so.

17   Q.    You -- or provide --

18   A.    I don't think so.  I only have my own e-mail that I use.

19   Q.    But you hadn't provided that?

20   A.    Not that I remember.

21   Q.    In fact, the person who --

22           THE COURT:  Mr. Aloe, this is in effect your witness;

23   I encourage you not to lead.

24           MR. ALOE:  Okay.  I apologize.

25   Q.    Do you know who Eric Levine is?

87-10 51ST AVENUE OWNERS CORP.

1    A.    I spoke to him.  Like two weeks ago he was calling me.  He

2    was the lawyer.

3    Q.    Did he speak to you about the settlement agreement?

4    A.    Vaguely.  His main concern was that he was --

5    Q.    I didn't ask you what his concern is; I asked you whether

6    you spoke to him?

7    A.    About the release?

8    Q.    Did he give you advice about the settlement agreement; yes

9    or no?

10   A.    Let me think.  Not really.

11   Q.    Did he talk to you about the settlement agreement?

12   A.    Not in detail.  I mean, I didn't --

13   Q.    Did he -- yes or no, did he talk to you about the

14   settlement agreement?

15   A.    Settlement agreement.  I -- I'm not sure.  I mean, we

16   spoke, but I was so stressed out when I was speaking to him I

17   don't even -- I don't remember what he was --

18             THE COURT:  Mr. Aloe, can you wrap this up?

19             MR. ALOE:  I can, Your Honor.  I have no other

20   questions, Your Honor.

21             THE COURT:  Thank you.

22             Mr. Rachmuth, I thought it appropriate to begin with

23   Mr. Aloe because of the --

24             MR. RACHMUTH:  I apologize for --

25             THE COURT:  -- my sense of the interests of the

87-10 51ST AVENUE OWNERS CORP.

1   various parties, that seemed the right sequence.  I'm going to

2   urge you to be as brief as you can be.

3           MR. RACHMUTH:  I just have stage setting questions.

4           THE COURT:  I'm sorry?

5           MR. RACHMUTH:  I apologize.

6   CROSS-EXAMINATION

7   BY MR. RACHMUTH:

8   Q.   Mr. Sheehan, do you take any medications regularly?

9   A.   I don't.

10  Q.   Are you on any medicines right now?

11  A.   No.

12  Q.   Have you taken any substances that would impair your

13  thinking or your --

14  A.   No.  I really don't.

15  Q.   No alcohol or drugs?

16  A.   No.  I just have, like, anxiety symptoms that --

17  Q.   Do you take anything for anxiety?

18  A.   I don't.  I'm trying to, like now, but --

19  Q.   When you say you're trying to, what do --

20  A.   I saw a psychiatrist the other day, but she wouldn't give

21  me any medication until I got a complete medical exam.

22          MR. RACHMUTH:  No further questions, Your Honor.

23          THE COURT:  Thank you.  All right.  I would like you

24  to stay exactly where you are.  Give me about a minute to

25  confer with my court and deputy about some scheduling issues,

87-10 51ST AVENUE OWNERS CORP.

1    and I'll be back to give you my determination.  But you can

2    stay right where you are, this will be just a moment or two.

3           MR. RACHMUTH:  Your Honor, may I confer with my client

4    in the hall while you're off the bench?

5           THE COURT:  Yes.  But I'm not going to wait for you

6    when I come back, because it is so late.

7           MR. RACHMUTH:  Understood.

8           THE COURT:  So I urge you not to go away.

9           THE CLERK:  All rise.

10          (Recess from 7:14 p.m. until 7:15 p.m.)

11          (Audio starts mid-sentence)

12          THE COURT:  -- with the collection of rents on consent

13    as reflected in the record, Empire and its officers and

14    directors are directed to refrain from interfering with the

15    collection of rents.  I think the consent is -- Mr. Aloe, can

16    you confirm as counsel that Empire consents to that relief?

17          MR. ALOE:  Empire consents to the collection of rents.

18    Obviously the only -- the two retained apartments they're

19    allowed to retain, but the ones that are being turned over they

20    are going to refrain from collecting --

21          THE COURT:  Let's be clear.  The request was for an

22    order directing Empire to refrain from interfering with the

23    collection of rents.

24          MR. ALOE:  That's correct.

25          THE COURT:  All right.  And does Empire and its

87-10 51ST AVENUE OWNERS CORP.

1    officers and directors, as indicated by the testimony, consent

2    to that relief?

3            MR. ALOE:  Yes.

4            THE COURT:  All right.  In view of the record that's

5    been made today, I'd like to ask Mr. Clausell's counsel if Mr.

6    Clausell similarly consents to a direction not to interfere

7    with the collection of rent?

8            MR. RACHMUTH:  He consents, Your Honor.

9            THE COURT:  All right.  So that is on the record.  It

10   is so ordered.  And I will ask the parties to submit an

11   appropriate stipulation; I would like it as promptly as

12   possible.

13           Separately, that order to show cause also poses the

14   question whether Empire and its officers and directors should

15   be required to sign the settlement agreement and mutual

16   releases.  The document has been marked and admitted in

17   evidence as Exhibit 1.  That is marked off the calendar as moot

18   because the document has been signed.

19           With respect to the second order to show cause, it

20   poses the question whether KTA's motion to be relieved as

21   counsel should be restored to the Court's calendar.  Mr. Aloe,

22   are you still seeking this relief?

23           MR. ALOE:  I believe.  I filed that motion or that

24   request after having been terminated by counsel.  Unless my

25   clients are prepared to say otherwise, I am not --

87-10 51ST AVENUE OWNERS CORP.

1          THE COURT:  Mis --

2          MR. ALOE:  I have not withdrawn that request.

3          THE COURT:  All right.  The matter will be restored to

4    the calendar.  The motion to withdraw will be restored to the

5    calendar.  I take it there is no opposition to the restoration

6    to the calendar.  And it will be adjourned to our next date,

7    which I anticipate and for today's -- this evening's purposes,

8    direct will be next Wednesday --

9          THE CLERK:  June --

10         THE COURT:  -- June 13th --

11         THE CLERK:  At 2 o'clock.

12         THE COURT:  -- at 10 a.m. --

13         10.

14         THE CLERK:  Okay.

15         THE COURT:  At 10 a.m. here in this courtroom.  If

16   that is changed you'll be contacted by my courtroom deputy.  I

17   want you to be absolutely certain that my deputy knows how to

18   reach you and that the information she's provided is current.

19         Mr. Sheehan, the Court has tried to serve papers on

20   you.  We were not successful in the ordinary ways; we had to

21   use the United States Marshals Service.  I would like to be

22   sure that Empire's counsel -- since you're president of

23   Empire -- knows how you can be reached.  Can you take care of

24   that, please?

25         THE WITNESS:  Yes.

87-10 51ST AVENUE OWNERS CORP.

1      THE COURT:  Thank you very much.  This is --

2      (Break in audio from 7:18 p.m. until 7:19 p.m.)

3      (Audio starts mid-sentence)

4      THE COURT:  -- all of the documents that are within

5   the scope of the Court's existing orders, and all of the

6   business records of both Empire and the debtor.  And I will

7   view with the greatest concern any steps that are taken to

8   either disobey a court order or to promote the disobedience to

9   a court order by another.  I want there to be no ambiguity

10  about how strongly I feel about the integrity of this Court's

11  process and the integrity of an order issued by a federal

12  court.

13      I think that's as far as we can go today.  Thank you

14  for your time and your patience.

15      UNIDENTIFIED SPEAKER:  Your Honor --

16      THE COURT:  And for the record that we've made.

17      THE CLERK:  All rise.

18      UNIDENTIFIED SPEAKER:  I'm sorry.

19      UNIDENTIFIED SPEAKER:  Your Honor?

20      (Break in audio from 7:19 p.m. until 7:20 p.m.)

21      THE COURT:  The question has been raised by debtor's

22  counsel with respect to an issuance of an order directing the

23  tenants how to pay their rent.  I will consider any stipulation

24  that is submitted by the parties, and I will do my best to get

25  it up on the docket promptly if an appropriate stipulation is

87-10 51ST AVENUE OWNERS CORP.

1   submitted.  There is no request before me in writing on notice

2   to issue such an order.

3          Mr. Magaliff, I thank you for bringing that matter to

4   my attention, because it was previously my intention to make

5   clear that those matters on the record and in my addressing the

6   matters that are before the Court today, I neglected to address

7   that matter -- which is not as a matter of the Court's calendar

8   on the docket today.  But it seems to me that it may well be an

9   appropriate topic for a stipulation between and among the

10  parties.  It does not seem substantively to be contested based

11  on the evidence that was taken today, nor in respect of the

12  consensual direction with respect to the first component of the

13  first order to show cause on today's calendar.

14         So I look forward to receiving such a stipulation if

15  one can be achieved.  It seems to me that the record is clear

16  that the noninterference by Empire in the collection of rent is

17  consistent with rent being paid to the outside property

18  manager, but I also understand that a clear order will be

19  helpful.  I will see you on Wednesday.  Thank you.

20         IN UNISON:  Thank you, Judge.

21  (Whereupon these proceedings were concluded at 7:21 PM)

22

23

24

25

```
 1
 2                        I N D E X
 3
 4    WITNESS              EXAMINATION BY      PAGE
 5    Erik Garcia          Mr. Magaliff        19
 6    Erik Garcia          Mr. Spizz           22
 7    Erik Garcia          Mr. Weinstein       24
 8    Erik Garcia          Mr. Spizz           38
 9    Erik Garcia          Mr. Magaliff        41
10    Paul Peterson        Mr. Magaliff        43
11    Paul Peterson        Mr. Spizz           56
12    Paul Peterson        Mr. Weinstein       74
13    Paul Peterson        Mr. Miller          102
14    Paul Peterson        Mr. Aloe            104
15    Paul Peterson        Mr. Spizz           105
16    Paul Peterson        Mr. Aloe            106
17    James Sheehan        Mr. Magaliff        109
18    James Sheehan        Mr. Spizz           132
19    James Sheehan        Mr. Weinstein       146
20    James Sheehan        Mr. Aloe            147
21    James Sheehan        Mr. Rachmuth        150
22
23                      E X H I B I T S
24    DEBTOR'S          DESCRIPTION          MARKED ADMITTED
25    2                 Order to show cause    23       79
```

```
 1   3              Letter dated 5/31/2012   46      51

 2   4              Letter dated 5/14/2012   47

 3   5              Bank statement           86

 4   1              Settlement agreement    110     116

 5                  and mutual releases

 6

 7

 8                        RULINGS

 9                                          Page    Line

10   Order to show cause directing Empire State   152    10

11   Conglomerates, Inc. to refrain from

12   interfering with the collection of rents

13   granted

14   Order to show cause why KTA's motion to be   153    5

15   relieved as counsel should not be restored

16   to the Court's calendar denied

17

18

19

20

21

22

23

24

25
```

1

2                      C E R T I F I C A T I O N

3

4    I, Dena Page, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9

10

_____

11

DENA PAGE

12

AAERT Certified Electronic Transcriber CET**D-629

13

14

eScribers

15

700 West 192nd Street, Suite #607

16

New York, NY 10040

17

18

Date:   June 11, 2012

19

20

21

22

23

24

25